Margaret CLOVER and Richard S. Clover, Plaintiffs and Appellants,

v.

SNOWBIRD SKI RESORT, dba Plaza Restaurant, a Utah corporation; and Chris Zulliger, Defendants and Appellees.

No. 890070.

Supreme Court of Utah.

March 1, 1991.

Richard D. Burbidge, Stephen B. Mitchell, Peter L. Rognlie, Salt Lake City, for plaintiffs and appellants.

Jay E. Jensen, Todd S. Winegar, Salt Lake City, for defendants and appellees.

HALL, Chief Justice:

Plaintiff Margaret Clover sought to recover damages for injuries sustained as the result of a ski accident in which Chris Zulliger, an employee of defendant Snowbird Corporation ("Snowbird"), collided with her. From the entry of summary judgment in favor of defendants, Clover appeals.

Many of the facts underlying Clover's claims are in dispute. Review of an order granting summary judgment requires that the facts be viewed in a light most favorable to the party opposing summary judgment.[1] At the time of the accident, Chris Zulliger was employed by Snowbird as a chef at the Plaza Restaurant. Zulliger was supervised by his father, Hans Zulliger, who was the head chef at both the Plaza, which was located at the base of the resort, and the Mid–Gad Restaurant, which was located halfway to the top of the mountain. Zulliger was instructed by his father to make periodic trips to the Mid–Gad to monitor its operations. Prior to the accident, the Zulligers had made several inspection trips to the restaurant. On at least one occasion, Zulliger was paid for such a trip.

---

1. *Culp Constr. Co. v. Buildmart Mall,* 795 P.2d 650, 651 (Utah 1990).

He also had several conversations with Peter Mandler, the manager of the Plaza and Mid–Gad Restaurants, during which Mandler directed him to make periodic stops at the Mid–Gad to monitor operations.

On December 5, 1985, the date of the accident, Zulliger was scheduled to begin work at the Plaza Restaurant at 3 p.m. Prior to beginning work, he had planned to go skiing with Barney Norman, who was also employed as a chef at the Plaza. Snowbird preferred that their employees know how to ski because it made it easier for them to get to and from work. As part of the compensation for their employment, both Zulliger and Norman received season ski passes. On the morning of the accident, Mandler asked Zulliger to inspect the operation of the Mid–Gad prior to beginning work at the Plaza.

Zulliger and Norman stopped at the Mid–Gad in the middle of their first run. At the restaurant, they had a snack, inspected the kitchen, and talked to the personnel for approximately fifteen to twenty minutes. Zulliger and Norman then skied four runs before heading down the mountain to begin work. On their final run, Zulliger and Norman took a route that was often taken by Snowbird employees to travel from the top of the mountain to the Plaza. About midway down the mountain, at a point above the Mid–Gad, Zulliger decided to take a jump off a crest on the side of an intermediate run. He had taken this jump many times before. A skier moving relatively quickly is able to become airborne at that point because of the steep drop off on the downhill side of the crest. Due to this drop off, it is impossible for skiers above the crest to see skiers below the crest. The jump was well known to Snowbird. In fact, the Snowbird ski patrol often instructed people not to jump off the crest. There was also a sign instructing skiers to ski slowly at this point in the run. Zulliger, however, ignored the sign and skied over the crest at a significant speed. Clover,

who had just entered the same ski run from a point below the crest, either had stopped or was traveling slowly below the crest. When Zulliger went over the jump, he collided with Clover, who was hit in the head and severely injured.

Clover brought claims against Zulliger and Snowbird, alleging that (1) Zulliger's reckless skiing was a proximate cause of her injuries, (2) Snowbird is liable for Zulliger's negligence because at the time of the collision, he was acting within the scope of his employment, (3) Snowbird negligently designed and maintained its ski runs, and (4) Snowbird breached its duty to adequately supervise its employees. Zulliger settled separately with Clover. Under two separate motions for summary judgment, the trial judge dismissed Clover's claims against Snowbird for the following reasons: (1) as a matter of law, Zulliger was not acting within the scope of his employment at the time of the collision, (2) Utah's Inherent Risk of Skiing Statute, Utah Code Ann. §§ 78–27–51 to –54 (Supp.1986), bars plaintiff's claim of negligent design and maintenance, and (3) an employer does not have a duty to supervise an employee who is acting outside the scope of employment.

## I. STANDARD OF REVIEW

Summary judgment is proper in cases where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[2] In cases where the facts are in dispute, summary judgment is only granted when, viewing the facts in a light most favorable to the party opposing summary judgment, the moving party is entitled to judgment. Therefore, when reviewing an order granting summary judgment, the facts are to be liberally construed "in favor of the parties opposing the motion, and those parties are to be given the benefit of all inferences which might reasonably be drawn from the evidence."[3] The determination of whether

2. Utah R.Civ.P. 56(c); see, e.g., Utah State Coalition of Senior Citizens v. Utah Power & Light Co., 776 P.2d 632, 634 (Utah 1989).

3. Payne ex rel. Payne v. Myers, 743 P.2d 186, 187–88 (Utah 1987); see also, e.g., Owens v. Garfield, 784 P.2d 1187, 1188 (Utah 1989).

the facts, viewed in this light, justify the entry of judgment is a question of law. We accord the trial court's conclusions of law no deference, but review them for correctness.[4]

## II. SCOPE OF EMPLOYMENT

■ Under the doctrine of respondeat superior, employers are held vicariously liable for the torts their employees commit when the employees are acting within the scope of their employment.[5] Clover's respondeat superior claim was dismissed on the ground that as a matter of law, Zulliger's actions at the time of the accident were not within the scope of his employment. In a recent case, *Birkner v. Salt Lake County*,[6] this court addressed the issue of what types of acts fall within the scope of employment. In *Birkner*, we stated that acts within the scope of employment are " 'those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.' "[7] The question of whether an employee is acting within the scope of employment is a question of fact. The scope of employment issue must be submitted to a jury "whenever reasonable minds may differ as to whether the [employee] was at a certain time involved wholly or partly in the performance of his [employer's] business or within the scope of employment."[8] In situations where the activity is so clearly within or without the scope of employment that reasonable minds cannot differ, it lies within the prerogative of the trial judge to decide the issue as a matter of law.[9]

In *Birkner*, we observed that the Utah cases that have addressed the issue of whether an employee's actions, as a matter of law, are within or without the scope of employment have focused on three criteria.[10] "First, an employee's conduct must be of the general kind the employee is employed to perform.... In other words, the employee must be about the employer's business and the duties assigned by the employer, as opposed to being wholly involved in a personal endeavor."[11] Second, the employee's conduct must occur substantially within the hours and ordinary spatial boundaries of the employment.[12] "Third, the employee's conduct must be motivated at least in part, by the purpose of serving the employer's interest."[13] Under specific factual situations, such as when the employee's conduct serves a dual purpose [14] or when the employee takes a personal detour in the course of carrying out his employer's directions,[15] this court

4. *Blue Cross & Blue Shield v. State of Utah*, 779 P.2d 634, 636 (Utah 1989); *Bonham v. Morgan*, 788 P.2d 497, 499 (Utah 1989).

5. *See* W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984). *See generally, e.g., Whitehead v. Variable Annuity Life Ins.*, 801 P.2d 934, 935 (Utah 1989); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1056-59 (Utah 1989).

6. 771 P.2d 1053 (Utah 1989).

7. *Birkner v. Salt Lake County*, 771 P.2d at 1056 (quoting W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984)).

8. *Carter v. Bessey*, 97 Utah 427, 93 P.2d 490, 493 (1939).

9. *Birkner v. Salt Lake County*, 771 P.2d at 1057.

10. *See* Restatement (Second) of Agency § 228 (1958); W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984).

11. *Birkner v. Salt Lake County*, 771 P.2d 1053, 1056-57 (Utah 1989); *see also Keller v. Gunn Supply Co.*, 62 Utah 501, 220 P. 1063, 1064 (1923).

12. *Birkner v. Salt Lake County*, 771 P.2d at 1057; *see also Cannon v. Goodyear Tire & Rubber Co.*, 60 Utah 346, 208 P. 519, 520-21 (1922).

13. *Birkner v. Salt Lake County*, 771 P.2d at 1057; *see also, e.g., Whitehead v. Variable Annuity Life Ins.*, 801 P.2d at 936; *Stone v. Hurst Lumber Co.*, 15 Utah 2d 49, 386 P.2d 910, 911 (1963); *Combes v. Montgomery Ward & Co.*, 119 Utah 407, 228 P.2d 272, 274 (1951).

14. *See Whitehead v. Variable Annuity Life Ins.*, 801 P.2d at 937 (applying the dual purpose rule); *see infra* notes 18-23 and accompanying text.

15. *See, e.g., Carter v. Bessey*, 93 P.2d at 492-93 (applying the substantial deviation test); *see infra* notes 24-31 and accompanying text.

has occasionally used variations of this approach. These variations, however, are not departures from the criteria advanced in *Birkner*. Rather, they are methods of applying the criteria in specific factual situations.

■ In applying the *Birkner* criteria to the facts in the instant case, it is important to note that if Zulliger had returned to the Plaza Restaurant immediately after he inspected the operations at the Mid–Gad Restaurant, there would be ample evidence to support the conclusion that on his return trip Zulliger's actions were within the scope of his employment. There is evidence that it was part of Zulliger's job to monitor the operations at the Mid–Gad and that he was directed to monitor the operations on the day of the accident. There is also evidence that Snowbird intended Zulliger to use the ski lifts and the ski runs on his trips to the Mid–Gad. It is clear, therefore, that Zulliger's actions could be considered to "be of the general kind that the employee is employed to perform." [16] It is also clear that there would be evidence that Zulliger's actions occurred within the hours and normal spatial boundaries of his employment. Zulliger was expected to monitor the operations at the Mid–Gad during the time the lifts were operating and when he was not working as a chef at the Plaza. Furthermore, throughout the trip he would have been on his employer's premises. Finally, it is clear that Zulliger's actions in monitoring the operations at the Mid–Gad, per his employer's instructions, could be considered "motivated, at least in part, by the purpose of serving the employer's interest." [17]

■ The difficulty, of course, arises from the fact that Zulliger did not return to the Plaza after he finished inspecting the facilities at the Mid–Gad. Rather, he skied four more runs and rode the lift to the top of the mountain before he began his return to the base. Snowbird claims that this fact shows that Zulliger's primary purpose for skiing on the day of the accident was for his own pleasure and that therefore, as a matter of law, he was not acting within the scope of his employment. In support of this proposition, Snowbird cites *Whitehead v. Variable Annuity Life Insurance.*[18] *Whitehead* concerned the dual purpose doctrine. Under this doctrine, if an employee's actions are motivated by the dual purpose of benefiting the employer and serving some personal interest, the actions will usually be considered within the scope of employment.[19] However, if the primary motivation for the activity is personal, "even though there may be some transaction of business or performance of duty merely incidental or adjunctive thereto, the [person] should not be deemed to be in the scope of his employment." [20] In situations where the scope of employment issue concerns an employee's trip, a useful test in determining if the transaction of business is purely incidental to a personal motive is "whether the trip is one which would have required the employer to send another employee over the same route or to perform the same function if the trip had not been made." [21]

In *Whitehead*, we held that an employee's commute home was not within the scope of employment, notwithstanding the plaintiff's contention that because the employee planned to make business calls from his house, there was a dual purpose for the commute.[22] In so holding, we noted that the business calls could have been made as easily from any other place as from the employee's home.[23] The instant case is distinguishable from *Whitehead* in that the activity of inspecting the Mid–Gad necessitates travel to the restaurant. Furthermore, there is evidence that the manager of

---

**16.** *Birkner v. Salt Lake County,* 771 P.2d at 1057.

**17.** *Id.*

**18.** 801 P.2d 934 (Utah 1989).

**19.** *Id.* at 937.

**20.** *Id.* (citing *Martinson v. W–M Ins. Agency,* 606 P.2d 256, 285 (Utah 1980)).

**21.** *Id.*

**22.** *Id.*

**23.** *Id.*

both the Mid–Gad and the Plaza wanted an employee to inspect the restaurant and report back by 3 p.m. If Zulliger had not inspected the restaurant, it would have been necessary to send a second employee to accomplish the same purpose. Furthermore, the second employee would have most likely used the ski lifts and ski runs in traveling to and from the restaurant.

There is ample evidence that there was a predominant business purpose for Zulliger's trip to the Mid–Gad. Therefore, this case is better analyzed under our decisions dealing with situations where an employee has taken a personal detour in the process of carrying out his duties. This court has decided several cases in which employees deviated from their duties for wholly personal reasons and then, after resuming their duties, were involved in accidents.[24] In situations where the detour was such a substantial diversion from the employee's duties that it constituted an abandonment of employment, we held that the employee, as a matter of law, was acting outside the scope of employment.[25] However, in situations where reasonable minds could differ on whether the detour constituted a slight deviation from the employee's duties or an abandonment of employment, we have left the question for the jury.[26]

Under the circumstances of the instant case, it is entirely possible for a jury to reasonably believe that at the time of the accident, Zulliger had resumed his employment and that Zulliger's deviation was not substantial enough to constitute a total abandonment of employment. First, a jury could reasonably believe that by beginning his return to the base of the mountain to begin his duties as a chef and to report to Mandler concerning his observations at the Mid–Gad, Zulliger had resumed his employ-

ment. In past cases, in holding that the actions of an employee were within the scope of employment, we have relied on the fact that the employee had resumed the duties of employment prior to the time of the accident.[27] This is an important factor because if the employee has resumed the duties of employment, the employee is then "about the employer's business" and the employee's actions will be "motivated, at least in part, by the purpose of serving the employer's interest." [28] The fact that due to Zulliger's deviation, the accident occurred at a spot above the Mid–Gad does not disturb this analysis. In situations where accidents have occurred substantially within the normal spatial boundaries of employment, we have held that employees may be within the scope of employment if, after a personal detour, they return to their duties and an accident occurs.[29]

Second, a jury could reasonably believe that Zulliger's actions in taking four ski runs and returning to the top of the mountain do not constitute a complete abandonment of employment. It is important to note that by taking these ski runs, Zulliger was not disregarding his employer's directions. In *Cannon v. Goodyear Tire & Rubber Co.,*[30] wherein we held that the employee's actions were a substantial departure from the course of employment, we focused on the fact that the employee's actions were in direct conflict with the employer's directions and policy.[31] In the instant case, far from directing its employees not to ski at the resort, Snowbird issued its employees season ski passes as part of their compensation.

These two factors, along with other circumstances—such as, throughout the day Zulliger was on Snowbird's property, there

24. See Carter v. Bessey, 93 P.2d at 491–93; Burton v. La Duke, 61 Utah 78, 210 P. 978, 979–82 (Utah 1922); Cannon v. Goodyear Tire & Rubber Co., 208 P. at 519–22.

25. Compare Cannon v. Goodyear Tire & Rubber Co., 208 P. at 521 (substantial deviation from employment) with Burton v. La Duke, 210 P. at 981–82 (distinguishing Cannon).

26. See Carter v. Bessey, 93 P.2d at 493; Burton v. La Duke, 210 P. at 981.

27. See Burton v. La Duke, 210 P. at 979–81.

28. See id. 210 P. at 981; see also Birkner v. Salt Lake County, 771 P.2d at 1057.

29. Burton v. La Duke, 210 P. at 981.

30. 60 Utah 346, 208 P. 519 (1922).

31. See id. 208 P. at 520–21.

was no specific time set for inspecting the restaurant, and the act of skiing was the method used by Snowbird employees to travel among the different locations of the resort—constitute sufficient evidence for a jury to conclude that Zulliger, at the time of the accident, was acting within the scope of his employment.

■ Although we have held that Zulliger's actions were not, as a matter of law, outside the scope of his employment under the *Birkner* analysis, it is important to note that Clover also argues that Zulliger's conduct is within the scope of employment under two alternative theories. First, she urges this court to adopt a position taken by some jurisdictions that focuses, not on whether the employee's conduct is motivated by serving the employer's interest, but on whether the employee's conduct is foreseeable.[32] Such an approach constitutes a significant departure from the *Birkner* analysis.

■ Second, Clover urges this court to apply the premises rule, a rule developed in workers' compensation cases,[33] to third-party tort-feasor claims. Under this rule, employees who have fixed hours and places of work will usually be considered to be acting outside of the scope of employment when they are traveling to and from work. However, they will be considered to be in the course of employment while traveling to and from work when they are on their employer's premises.[34] In this instance, we decline to adopt such an approach. It is to be noted that the policies behind workers' compensation law differ from the policies behind respondeat superior claims.[35] Furthermore, the premises rule departs from

the analysis in *Birkner* in that it focuses entirely upon the second criterion discussed in *Birkner*, the hours and ordinary spatial boundaries of the employment, to the exclusion of the first and third criteria. Situations like the instant case, where the employee has other reasons aside from traveling to work to be on the employer's premises, demonstrate the need for a more flexible and intricate analysis in respondeat superior cases. In fact, it is not entirely clear that the premises rule would apply in a workers' compensation case if the only connection an employee had with work was that the employee, after some recreational skiing, was returning to work on the employer's ski runs.[36] We therefore, in this instance, decline to adopt these approaches.

## III. NEGLIGENT DESIGN AND MAINTENANCE

■ The trial court dismissed Clover's negligent design and maintenance claim on the ground that such a claim is barred by Utah's Inherent Risk of Skiing Statute, Utah Code Ann. §§ 78–27–51 to –54 (Supp. 1986). This ruling was based on the trial court's findings that "Clover was injured as a result of a collision with another skier, and/or the variation of steepness in terrain." Apparently, the trial court reasoned that regardless of a ski resort's culpability, the resort is not liable for an injury occasioned by one or more of the dangers listed in section 78–27–52(1). This reasoning, however, is based on an incorrect interpretation of sections 78–27–51 to –54.

Utah Code Ann. §§ 78–27–51 and –52(1)[37] read in part:

---

32. See *Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 171 (2d Cir.1968); *Hinman v. Westinghouse Elec. Co.,* 2 Cal.3d 956, 471 P.2d 988, 990, 88 Cal.Rptr. 188, 190 (1970).

33. See *Soldier Creek Coal v. Bailey,* 709 P.2d 1165, 1166 (Utah 1985).

34. 1 A. Larson, *The Law of Workmen's Compensation* § 15.11 (1990).

35. See *id.* at § 15.15 (rationale for expansions of the premises rule different than rationale of respondeat superior).

36. See *Pypers v. Workmen's Compensation Appeal Bd.,* 105 Pa.Cmwlth. 448, 524 A.2d 1046, 1049 (1987) (when employee remains on premises for party, injury received while leaving not compensable).

37. The Passenger Tramway Act, Utah Code Ann. § 63–11–37 (Supp.1986), also provides protections to ski area operators. This statute allows actions to recover for injuries caused by unnecessary hazards in design, construction, and operation of tramways but not for injuries caused by "the hazards inherent in the sports of mountaineering, skiing and hiking." The protections ski area operators possess under section 63–11–

Inherent risks of skiing—Public policy

The Legislature finds that the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state.

It further finds that few insurance carriers are willing to provide liability insurance protection to ski area operators and that the premiums charged by those carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing. It is the purpose of this act, therefore, to clarify the law in relation to skiing injuries and the risks inherent in that sport, and to establish as a matter of law that certain risks are inherent in that sport, and to provide that, as a matter of public policy, no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks.

Inherent risk of skiing—Definitions

As used in this act:

(1) "Inherent risk of skiing" means those dangers or conditions which are an integral part of the sport of skiing, including, but not limited to: changing weather conditions, variations or steepness in terrain; snow or ice conditions; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, impact with lift towers and other structures and their components; collisions with other skiers; and a skier's failure to ski within his own ability.

Section 78–27–53 states that notwithstanding anything to the contrary in Utah's comparative fault statute, a skier cannot recover from a ski area operator for an injury caused by an inherent risk of skiing. Section 78–27–54 requires ski area operators to "post trail boards at one or more prominent locations within each ski area which shall include a list of the inherent risks of skiing

and the limitations on liability of ski area operators as defined in this act."

It is clear that sections 78–27–51 to –54 protect ski area operators from suits initiated by their patrons who seek recovery for injuries caused by an inherent risk of skiing. The statute, however, does not purport to grant ski area operators complete immunity from all negligence claims initiated by skiers. While the general parameters of the act are clear, application of the statute to specific circumstances is less certain. In the instant case, both parties urge different interpretations of the act. Snowbird claims that any injury occasioned by one or more of the dangers listed in section 78–27–52(1) is barred by the statute because, as a matter of law, such an accident is caused by an inherent risk of skiing. Clover, on the other hand, argues that a ski area operator's negligence is not an inherent risk of skiing and that if the resort's negligence causes a collision between skiers, a suit arising from that collision is not barred by sections 78–27–51 to –54.

Although the trial court apparently agreed with Snowbird, we decline to adopt such an interpretation.[38] The basis of Snowbird's argument is that the language of section 78–27–52(1) stating that " '[i]nherent risk of skiing' means those dangers or conditions which are an integral part of the sport of skiing, including but not limited to: ... collision with other skiers" must be read as defining all collisions between skiers as inherent risks. The wording of the statute does not compel such a reading. To the contrary, the dangers listed in section 78–27–52(1) are modified by the term "integral part of the sport of skiing." Therefore, ski area operators are protected from suits to recover for injuries caused by one or more of the dangers listed in section 78–27–52(1) only to the extent that those dangers, under the facts of each case, are integral aspects of the sport of skiing. Indeed, the list of

37 are not more expansive than the protections they possess under sections 78–27–51 to –54. Therefore, a separate analysis of section 63–11–37 is unnecessary in this context.

38. Because we interpret Utah Code Ann. §§ 78–27–51 to –54 as not prohibiting legitimate negligence claims, we do not reach Clover's argument that the statute violates article I, sections 1 and 11 of the Utah Constitution and the 14th amendment of the federal constitution.

dangers in section 78–27–52(1) is expressly nonexclusive. The statute, therefore, contemplates that the determination of whether a risk is inherent be made on a case-by-case basis, using the entire statute, not solely the list provided in section 78–27–52(1).

Furthermore, when the act is read in its entirety, no portion thereof is rendered meaningless. When reading section 78–27–52(1) in connection with section 78–27–54, it becomes clear that the relevance of section 78–27–52(1) is in insuring that ski area operators provide skiers with sufficient notice of the risks they face when participating in the sport of skiing, as well as ski area operators' liability in connection with these risks. It should also be noted that the interpretation urged by Snowbird would result in a wide range of absurd consequences.[39] For example, if a skier loses control and falls by reason of the negligence of an operator, recovery for injury would depend on whether, in the fall, the skier collides with a danger listed in section 78–27–52(1). Such a result is entirely arbitrary.

To the extent that the wording of section 78–27–52(1) creates uncertainty regarding the specific application of the act, that confusion should be resolved through the use of the rules of statutory construction. A rule of construction which this court has commonly applied is that the terms of a statute should be interpreted in accord with their usual and accepted meanings.[40] Another rule is that a statute should not be construed in a piecemeal fashion but as a comprehensive whole.[41] Furthermore, "[i]f there is doubt or uncertainty as to the meaning or application of the provisions of an act, it is appropriate to analyze the act in its entirety, in light of its objective, and to harmonize its provisions in accordance with its intent and purpose."[42] In cases such as this, where a statement of the statute's purpose is codified in the statute, this method of construction is particularly appropriate. It is also proper in construing a statute which deals with tort claims to interpret the statute in accord with relevant tort law. Finally, in dealing with an unclear statute, this court renders interpretations that will "best promote the protection of the public."[43]

In construing the statute in this manner, a helpful first step is to note that sections 78–27–51 to –54 limit the liability of ski area operators by defining the duty they owe to their patrons. The express purpose of the statute, codified in section 78–27–51, is "to clarify the law in relation to skiing injuries and the risk inherent in the sport ... and to establish [that] ... no person shall recover from a ski operator for injuries resulting from those inherent risks." Inasmuch as the purpose of the statute is to "clarify the law," not to radically alter ski resort liability, it is necessary to briefly examine the relevant law at the time the statute was enacted. Although there is limited Utah case law on point, when the statute was enacted the majority of jurisdictions employed the doctrine of primary assumption of risk in limiting ski resorts' liability for injuries their patrons received while skiing.[44] Terms utilized in the statute such as "inherent risk of skiing" and "assumes the risk" are the same terms relied upon in such cases. This language suggests that the statute is meant to achieve the same results achieved under the doctrine of primary assumption of risk.

**39.** When dealing with unclear statutes, this court renders interpretations that will avoid "absurd consequences." *Curtis v. Harmon Electronics,* 575 P.2d 1044, 1046 (Utah 1978).

**40.** *Utah County v. Orem City,* 699 P.2d 707, 708 (Utah 1985).

**41.** *Peay v. Board of Ed. of Provo City Schools,* 14 Utah 2d 63, 377 P.2d 490, 492 (Utah 1962).

**42.** *Osuala v. Aetna Life & Casualty,* 608 P.2d 242, 243 (Utah 1980) (footnotes omitted).

**43.** *Curtis v. Harmon Electronics,* 575 P.2d at 1046.

**44.** *See, e.g., Wright v. Mt. Mansfield Lift,* 96 F.Supp. 786, 791 (D.Vt.1951); *see also* Feuerhelm, *From Wright to Sunday and Beyond: Is the Law Keeping Up With the Skiers?,* 1985 Utah L.Rev. 885; Comment, *Utah's Inherent Risk of Skiing Act: Avalanche from Capitol Hill,* 1980 Utah L.Rev. 355 (authored by W. Faber).

In fact, commentators suggest that the statute was passed in reaction to a perceived erosion in the protection ski area operators traditionally enjoyed under the common law doctrine of primary assumption of risk.[45]

As we have noted in the past, the single term "assumption of risk" has been used to refer to several different, and occasionally overlapping, concepts.[46] One concept, primary assumption of risk, is simply "an alternative expression for the proposition that the defendant was not negligent, that is, there was no duty owed or there was no breach of an existing duty."[47] This suggests that the statute, in clarifying the "confusion as to whether a skier assumes the risks inherent in the sport of skiing," operates to define the duty ski resorts owe to their patrons.

Section 78–27–53 also supports the notion that the ski statute operates to define the duty of a ski resort. This section exempts injuries caused by the inherent risks of skiing from the operation of Utah's comparative fault statute, which was enacted to avoid the harsh results of the all-or-nothing nature of the former law by limiting a party's liability by the degree of that party's fault.[48] Comparative principles have been applied in cases dealing with contributory negligence,[49] secondary assumption of risk,[50] and strict liability.[51] Exempting suits concerning injuries caused by an inherent risk of skiing from the comparative fault statute is consistent with the assertion that the ski area operators are not at fault in such situations—that is, ski area operators have no duty to protect a skier from the inherent risks of skiing.

Finally, it is to be noted that without a duty, there can be no negligence. Such an interpretation, therefore, harmonizes the express purpose of the statute, protecting ski area operators from suits arising out of injuries caused by the inherent risks of skiing, with the fact that the statute does not purport to abrogate a skier's traditional right to recover for injuries caused by ski area operators' negligence.

A similar analysis leads to the conclusion that the duties sections 78–27–51 to –54 impose on ski resorts are the duty to use reasonable care for the protection of its patrons[52] and, under section 78–27–54, the duty to warn its patrons of the inherent risks of skiing. Beyond the general warning prescribed by section 78–27–54, however, a ski area operator is under no duty to protect its patrons from the inherent risks of skiing. The inherent risks of skiing are those dangers that skiers wish to confront as essential characteristics of the sport of skiing or hazards that cannot be

---

**45.** *See* Feuerhelm, *supra* note 44; Comment, *supra* note 44. In fact, Snowbird in its brief and at oral argument contended that the statute was intended to reassert the doctrine of primary assumption of risk as it relates to ski accident cases.

**46.** *See, e.g., Moore v. Burton Lumber & Hardware,* 631 P.2d 865, 869–71 (Utah 1981); *Jacobsen Constr. v. Structo–Lite Eng'g,* 619 P.2d 306, 309–12 (Utah 1980). In contract law, the term is used in connection with provisions in which one party "expressly contracts not to sue for injury or loss which may thereafter be occasioned by the acts of another." *Jacobsen Constr. v. Structo–Lite Eng'g,* 619 P.2d at 310. In the law of torts, the term has been used to describe two different concepts. In its most common context, secondary assumption of risk, the term refers to the unreasonable encounter of a known and appreciated risk. Secondary assumption of risk is, in reality, an aspect of contributory negligence. Primary assumption of risk involves relationships where the defendant owes no duty of care to the plaintiff. *Id.*

**47.** *Jacobsen Constr. v. Structo–Lite Eng'g,* 619 P.2d at 310.

**48.** *See* Utah Code Ann. §§ 78–27–37 to –43 (Supp.1986); *Moore v. Burton Lumber & Hardware,* 631 P.2d at 870.

**49.** *Acculog, Inc. v. Peterson,* 692 P.2d 728, 730 (Utah 1984).

**50.** *Moore v. Burton Lumber & Hardware,* 631 P.2d at 869–71.

**51.** *Mulherin v. Ingersoll–Rand,* 628 P.2d 1301, 1303 (Utah 1981).

**52.** Ski area operators which invite skiers onto their property for business purposes owe a duty of reasonable care for the protection of their patrons. *See Stevens v. Salt Lake County,* 25 Utah 2d 168, 478 P.2d 496, 498 (Utah 1970); *see also Wright v. Mt. Mansfield Lift Inc.,* 96 F.Supp. 786 (D.Vt.1951).

eliminated by the exercise of ordinary care on the part of the ski area operator.

As noted above, the purpose of the statute is to prohibit suits seeking recovery for injuries caused by an inherent risk of skiing. The term "inherent risk of skiing," using the ordinary and accepted meaning of the term "inherent," refers to those risks that are essential characteristics of skiing—risks that are so integrally related to skiing that the sport cannot be undertaken without confronting these risks. Generally, these risks can be divided into two categories. The first category of risks consists of those risks, such as steep grades, powder, and mogul runs, which skiers wish to confront as an essential characteristic of skiing. Under sections 78–27–51 to –54, a ski area operator is under no duty to make all of its runs as safe as possible by eliminating the type of dangers that skiers wish to confront as an integral part of skiing.[53]

The second category of risks consists of those hazards which no one wishes to confront but cannot be alleviated by the use of reasonable care on the part of a ski resort. It is without question that skiing is a dangerous activity. Hazards may exist in locations where they are not readily discoverable. Weather and snow conditions can suddenly change and, without warning, create new hazards where no hazard previously existed. Hence, it is clearly foreseeable that a skier, without skiing recklessly, may momentarily lose control or fall in an unexpected manner. Ski area operators cannot alleviate these risks, and under sections 78–27–51 to –54, they are not liable for injuries caused by such risks. The only duty ski area operators have in regard to these risks is the requirement set out in section 78–27–54 that they warn their patrons, in the manner prescribed in the stat-

ute, of the general dangers patrons must confront when participating in the sport of skiing. This does not mean, however, that a ski area operator is under no duty to use ordinary care to protect its patrons. In fact, if an injury was caused by an unnecessary hazard that could have been eliminated by the use of ordinary care, such a hazard is not, in the ordinary sense of the term, an inherent risk of skiing and would fall outside of sections 78–27–51 to –54.

This definition of a ski area operator's duty is consistent with the approach used by the majority of jurisdictions in ski accident cases prior to the time the statute was adopted.[54] At the time the statute was enacted, the landmark case in the area was *Wright v. Mt. Mansfield Lift Inc.*[55] In *Wright,* a skier who was injured in a collision with a snow-covered stump was denied recovery under the doctrine of primary assumption of risk. The court held that although a ski resort has a duty to advise its patrons of specific hazards "which reasonable prudence would have foreseen and corrected,"[56] the resort was under no duty to protect its patrons from those dangers that are inherent in the sport to the extent that those dangers are obvious and necessary.[57] Specifically, the court held that the existence of the stump was not reasonably foreseeable and was the type of general hazard that was obvious to the plaintiff.[58] This approach is consistent with the definition of duty derived from the use of the ordinary meaning of the terms of the statute. The prerequisite that a risk be necessary is consistent with the ordinary meaning of the term inherent. Similarly, the prerequisite that the risk be obvious is consistent with the requirement of section 78–27–54 that ski area operators warn of the inherent risk of skiing. This approach, therefore, fulfills the express purpose of the

---

53. Ski area operators, however, should use reasonable care to inform their patrons of the degree of difficulty of their runs.

54. *See supra* notes 44–45 and accompanying text.

55. 96 F.Supp. 786 (D.Vt.1951).

56. *Id.* at 790.

57. *See id.* at 790–92.

58. *See id.* In fact, the *Wright* court found that in 1951, requiring a ski resort to be aware of the type of hazard that caused the injury "would be to demand the impossible." *Id.* at 791. In contrast in this case, Clover claims that Snowbird had actual knowledge of the danger that caused her injury.

statute, "clarifying the law in relation to skiing injuries."

■ Having established the proper interpretation of sections 78–27–51 to –54, the next step is to determine whether, given this interpretation, there is a genuine issue of material fact in regard to Clover's claim. First, the existence of a blind jump with a landing area located at a point where skiers enter the run is not an essential characteristic of an intermediate run. Therefore, Clover may recover if she can prove that Snowbird could have prevented the accident through the use of ordinary care. It is to be noted that Clover's negligent design and maintenance claim is not based solely on the allegation that Snowbird allowed conditions to exist on an intermediate hill which caused blind spots and allowed skiers to jump. Rather, Clover presents evidence that Snowbird was aware that its patrons regularly took the jump, that the jump created an unreasonable hazard to skiers below the jump, and that Snowbird did not take reasonable measures to eliminate the hazard. This evidence is sufficient to raise a genuine issue of material fact in regard to Clover's negligent design and maintenance claim.

## IV. NEGLIGENT SUPERVISION

■ The trial court dismissed Clover's negligent supervision claim on the ground that an employer does not have a duty to supervise an employee whose actions are outside the scope of employment. Although we have held that Zulliger's actions were not, as a matter of law, outside the scope of employment, it is important to note that the trial court misstated the law. Regardless of whether an employer can be held vicariously liable for its employee's actions under the doctrine of respondeat superior, an employer may be directly liable for its own negligence in hiring or supervising employees.[59] In the instant case, Clover claims that Snowbird was negligent in not supervising its employees in regard to the practice of reckless skiing.

In support of this contention, Clover provides evidence that Snowbird furnished its employees with ski passes as partial compensation for employment, was aware of the dangerous condition created by the jump, and was aware that its employees often took the jump, but did not take any measures to alleviate the danger. This evidence is sufficient to raise a genuine issue of material fact in regard to Clover's negligent supervision claim.

In light of the genuine issues of material fact in regard to each of Clover's claims, summary judgment was inappropriate.

Reversed and remanded for further proceedings.

HOWE, Associate C.J., STEWART and DURHAM, JJ., and JACKSON, Court of Appeals Judge, concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein; JACKSON, Court of Appeals Judge, sat.

---

59. *See, e.g., Birkner v. Salt Lake County,* 771 P.2d 1053, 1059 (Utah 1989); *Stone v. Hurst Lumber Co.,* 15 Utah 2d 49, 386 P.2d 910, 911–12 (1963); *see also* W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 501–02 (5th ed. 1984).