**Paul and Joyce ROWAN, Plaintiffs,**

v.

**VAIL HOLDINGS, INC., a Colorado corporation, d/b/a Vail Associates, Inc., Vail Associates, Inc., a Colorado corporation; Beaver Creek Associates, Inc., a Colorado corporation d/b/a Beaver Creek Ski Area, and Salomon S.A., a French corporation, Defendants.**

**Civil Action No. 96–D–2761.**

United States District Court,
D. Colorado.

Dec. 24, 1998.

Ross B.H. Buchanan, Buchanan, Jurdem & Zulauf, Denver, CO, for Plaintiffs.

Peter W. Rietz, Keith R. Ollvera, White & Steele, P.C., Mark R. Davis, Wood, Ris & Hames, P.C., William R. White, Jr., Byrne, Kiely & White, Denver, CO, for Defendants.

## ORDER

DANIEL, District Judge.

### I. *INTRODUCTION*

This case arises out of a fatal ski accident on December 1, 1994, at Beaver Creek wherein the Plaintiffs' son, Perry Rowan ("Rowan") was killed when he ran into a picnic or observation deck (referred to herein as "picnic deck") located near the base of a race course while glide testing skis for Salomon, S.A. ("SSA"). SSA is the parent company of Rowan's employer, Salomon North America, Inc. ("SNA"). Plaintiffs' action is a wrongful death action asserting the following claims: negligence/negligence per se against Vail; (2) breach of contract/third party beneficiary against Vail; and (3) negligence against Defendant SSA.

This matter is before the Court in connection with two pending motions for summary judgment. Vail Holdings, Inc., Vail Associates, Inc. and Beaver Creek Associates, Inc. (referred to collectively as "Vail") filed a Motion for Summary Judgment on November 21, 1997, which was accepted for filing on December 5, 1997. Defendant SSA filed a Motion for Summary Judgment on February 3, 1998. The Court held a hearing on these motions on November 25, 1998.

### II. *FACTUAL BACKGROUND*

Construing the facts in the light most favorable to Plaintiffs, as I must for these summary judgment motions, Rowan was an employee of SNA but was working for SSA's glide unit at the time of the accident at the request of his supervisor, Jim Schaffner ("Schaffner"). Rowan was a national caliber racer with international racing experience, but had not raced for a number of years. Glide testing determines which ski waxes and structures of the ski bottom run the fastest on the snow located at the venue where the testing is being determined. The purpose of the glide testing at issue herein was to test World Cup downhill skis for the World Cup Downhill that would take place shortly thereafter in Vail. The results of the testing show that Rowan attained speeds in excess of 120 kilometers per hour on the first two days of testing.

The course being used by Rowan for the glide testing was located in an area that was roped off and closed to the general public. The glide testing took place over a three day period. Rowan was killed on the third day. That morning, Rowan and another tester, Jennifer Brown ("Brown"), had been asked to sign, and signed, liability releases. The release signed by Rowan, attached as Exhibit D to Vail's Memorandum Brief in Support of Summary Judgment, is summarized below.

Beneath the space to print the name, date and place of the event, are bold and capital letters stating, "**PLEASE READ CAREFULLY. THIS IS A RELEASE OF LIABILITY AND WAIVER OF LEGAL RIGHTS.**" Following this language, the release stated in pertinent part:

1. I acknowledge that participation in ski racing (the "Event"), described above, or training in connection with such Event, is **HAZARDOUS** and involves a great risk of physical injury. **I expressly assume all risk associated with participating in or training for the Event,** including, without limitations, using ski lifts. I understand that I have the opportunity to inspect the race course and area prior to training for or participating in the Event and I assume the risk of all course conditions.

2. WARNING—Under Colorado law, a skier assumes the risk of any injury to person or property resulting from any of the inherent dangers and risks of skiing and may not recover from any ski area operator for any injury resulting from any of the inherent dangers and risks of skiing, including: Changing weather conditions; existing and changing snow conditions; bare spots; rocks; stumps; trees; collisions with natural objects, man-made objects, or other skiers; variations in terrain; and the failure of skiers to ski within their own natural abilities.

3. **In consideration of receiving permission to take place in the Event, I agree to release and hold harmless Vail Associates, Inc., its subsidiaries and affiliates . . . from any and claims I might state as a result of physical injury, including**

**death, . . . including those claims based on negligence or breach of warranty.**

.   .   .   .   .

5. This agreement is binding on my estate, heirs, administrators and assigns and shall be governed by the laws of Colorado. . . .

At the bottom, before the date and signature, the release states in capital and bold letters, "**I HAVE CAREFULLY READ THE FOREGOING LIABILITY RELEASE, UNDERSTAND ITS CONTENTS AND SIGN IT WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE. I AM AT LEAST 18 YEARS OF AGE.**"

After signing the release, Rowan completed approximately 10 runs. On his next run, Rowan lost control near the finish line of the race course, fell and slid into one of the unpadded wood support beams of the picnic deck, sustaining fatal injuries. Allegedly, on the day before the accident, a conversation occurred between Rowan, Brown, and Nick Scales ("Scales"), an employee with Vail. Vail claims that Scales asked Brown and Rowan if they thought the course was safe. They stated in response that they did not feel it was necessary to add any padding to the course. Plaintiffs admit that Scales has testified to such a conversation, but assert that Brown did tell Scales at one point that she thought the course was dangerous, and that the existence of the deck played a role in that assessment because it was an obstacle. Plaintiffs contend that because of Scales' concerns and a few close calls that the testers had with the deck, Scales had Rowan and Brown sign the releases on the day of the fatality.

In summary of the Plaintiffs' claims, they contend that Vail was negligent in the placement of the deck and in not padding it; that the deck had been padded at one point but the padding was negligently removed; that other obstacles in the ski area were padded and that the deck could easily have been padded; that padding was installed after Rowan's death; that there had been other close calls the first two days because the construction of the course required the skiers to make a hard left turn at the end of the

course to avoid the deck; that another tester, Tal Klein, seriously injured her knee when she found herself headed toward the deck at high speed; and that there was another course adjacent to the one being used that could have been set up for the testers, but Vail had made the decision not to groom that course.

As to the release, Plaintiffs contend that it was a standard printed form, that there were no discussions about the release, that when it was presented to Rowan and Brown they were told that they "needed to sign these releases before we could get going for the day", and that no additional consideration was provided for the release that had not been provided the first two days. Although Vail claims that it is standard procedure to have glide testers sign releases, and that its employees had simply forgotten to have Rowan and Brown sign one the first two days of testing, there is no such procedure in any of Vail's documents, and Vail was unable to produce any other releases that glide testers had signed. Further, none of the three participants in previous glide testing episodes conducted in Vail or Beaver Creek recalled signing a release.

As to SSA, Plaintiffs contend that it had a duty to exercise reasonable care in its set-up and conduct of the testing of its ski racing products, so as to avoid the creation of an unreasonable risk of injury. Plaintiffs argue that SSA breached its duty in: (1) failing to make an adequate inspection of the course and recognizing and remedying the hazard which the picnic deck represented; (2) requesting or requiring that Vail make modifications to the course which were designed to maximize the speed of racers as they crossed the finish line, despite knowledge of the danger represented by the location of the picnic

deck; (3) failing to require the placement of pads or other shock-absorbent materials on the deck, especially following instances in which testers very nearly collided with the picnic deck; and (4) failing to properly instruct and supervise the testers in connection with the glide testing.

## III. ANALYSIS

### A. VAIL'S MOTION FOR SUMMARY JUDGMENT

There are several issues raised by this Motion. For the reasons stated below, I DENY Vail's motion for summary judgment.[1]

#### 1. The Validity Of The Liability Release

##### a. Whether the Release Binds Rowans' Heirs

■ Before determining whether the release is valid, the first issue that I examine is Plaintiffs' argument that an exculpatory agreement cannot bar individuals who were not parties to the release (in this case, Perry Rowan's parents) from bringing an action to which they are individually entitled. In support of this argument, Plaintiffs rely on *Barker v. Colorado Region–Sports Car Club of America Inc.*, 35 Colo.App. 73, 532 P.2d 372 (Colo.App.1974); *Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273 (10th Cir.1997); *Scroggs v. Coast Community College Dist.*, 193 Cal.App.3d 1399, 239 Cal.Rptr. 916 (4 Dist.1987); *Madison v. Superior Court*, 203 Cal.App.3d 589, 250 Cal.Rptr. 299 (2 Dist.), *opinion modified* (1988); and *Dettman–Brunsfeld v. Szanto*, 267 Ill.App.3d 1050, 204 Ill.Dec. 908, 642 N.E.2d 809 (1 Dist.1994), *judgment vac'd*, 164 Ill.2d 561, 212 Ill.Dec. 979, 658 N.E.2d 461 (1995).

---

1. Vail's motion for summary judgment addressed the only claim then pending against it by Plaintiffs, the negligence/negligence per se claim. After Vail's motion and accompanying brief were filed, the brief was stricken for failure to comply with the Court's Hearing, Conference & Trial Procedures. Vail then moved to file a brief in excess of the 15 page limit, which the Court granted by Order dated December 5, 1998. Through that Order, the brief previously filed was accepted as of that date. In the same Order, the Court granted Plaintiffs leave to file their Amended Complaint, which added a second

claim for relief against Vail for breach of contract. That claim was obviously not addressed by Vail in its motion or brief, since they were filed before the Amended Complaint was accepted by the Court. Accordingly, Vail never actually move for summary judgment on this claim, even though it briefly discussed this issue in a supplemental brief filed by Vail. Accordingly, I do not discuss or address herein the second claim for breach of contract against Vail. My discussion as to Vail's summary judgment motion focuses solely on the negligence/negligence per se claim.

■ Plaintiffs assert correctly that their wrongful death claim under Colo.Rev.Stat. § 13–21–201 is distinct from a survival action under Colo.Rev.Stat. § 13–20–101. In a survival action, the estate is the beneficiary of the surviving cause of action for actual losses suffered from the death of the decedent. In contrast, a wrongful death action allows the heirs to bring an independent cause of action (unrelated to the decedent's cause of action) to recover for their losses, which claim does not arise until the death of the decedent. Vail argues that regardless of the fact that a wrongful death action is an independent claim by the heirs, the statute and cases construing same hold that the heirs' right to bring such an action is dependent on the decedent's ability to have brought a claim against the person causing the injury.

I agree with Plaintiffs that the Colorado Court of Appeals in *Barker* and the Tenth Circuit in *Brooks* indicated that a release may not be binding on the decedent's heirs in certain situations. However, neither *Barker* or *Brooks* addressed the precise issue before me. *Barker* held that a husband's exculpatory release did not bar his wife's claim for lack of consortium and her claim as conservatrix of the estate of her husband. 532 P.2d at 379–80. *Barker* did not address the wrongful death statute or a claim thereunder. *Brooks* held that because the decedent's parents signed copies of the release on behalf of their son, *Barker* was inapplicable. 127 F.3d at 1276. It did not address whether *Barker* would have actually barred the parents' wrongful death claim if the parents had not signed the release. Accordingly, I find that these cases are not controlling on this issue.

I believe I am bound by the plain language of the wrongful death statute and the cases interpreting same. The statute, Colo.Rev. Stat. § 13–21–202, states:

When the death of a person is caused by a wrongful act, neglect, or default of another, *and the act, neglect, or default is such as would, if death had not ensured, have entitled the party injured to maintain an action and recover damages in respect thereof,* then, and in every such case, the person or the corporation which would have been liable, if death had not ensured,

shall be liable in an action for damages notwithstanding the death of the party injured.

*Id.* (emphasis added). Colorado courts interpreting the statute hold, consistent with the plain language of the statute, that the right to bring a wrongful death claim is dependent on the decedent's ability to have brought the claim. *Sigman v. Seafood Limited Partnership I,* 817 P.2d 527, 530 (Colo.1991); *Mangus v. Miller,* 35 Colo.App. 335, 535 P.2d 219, 221 (1975); *Crownover v. Gleichman,* 38 Colo.App. 96, 554 P.2d 313, 316 (1976), *aff'd,* 194 Colo. 48, 574 P.2d 497 (1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). I find that these cases, decided after *Barker,* appear to be dispositive of this issue.

Therefore, in this case, if Perry Rowan would have been barred from suing Vail because of the release, his parents also will be barred from asserting their wrongful death claim under the above authority. The next issue becomes whether the release is valid so as to preclude the negligence claim of Rowan's parents.

#### b. *Whether Adequate Consideration was Given for the Release*

■ Plaintiffs argue that the release is invalid because it constitutes a contract modification which is not supported by consideration. They assert that where the parties have reached an agreement and thereafter one party seeks to modify the terms of the agreement, the modification requires separate consideration, citing *Hoagland v. Celebrity Homes, Inc.,* 40 Colo.App. 215, 572 P.2d 493, 494 (Colo.App.1977) (builder's requirement that buyers of home execute letter of warranty after home was completed, and after purchase contract signed, was "either a unilateral modification to the purchase contract or a unilateral effort on the builder's part, without consideration, to limit its warranty").

Plaintiffs argue that Vail reached an agreement with Rowan for glide testing. The agreement was that Rowan would test Salomon skis for three days on a venue chosen by Vail, and in exchange, Vail would agree to provide the venue and snowmobiles and drivers (at the rate of $50.00 per hour) to

facilitate the testing. The parties operated under this contract for the first two days. On the third day, after a series of close calls with the deck and an injury to tester Tal Klein, Rowan was asked to sign the release. Plaintiffs argue it is undisputed that Vail did not provide any additional service or assistance beyond what it provided the first two days in exchange for the release.

In response, Vail argues that the only contractual agreement between Salomon and Vail was that Salomon would pay Vail $50.00 per hour for snowmobiles. This agreement had nothing to do with Rowan's use of the race course, and the release signed by Rowan in no way modified this agreement. Vail did not charge Salomon or Rowan to use the race course. Thus, there was no contract between Vail and Salomon or Vail and Rowan with regard to Rowan's activities on the course. Further, Vail argues that the glide testing lasted for three days. At the beginning of each day, Rowan was given the opportunity to inspect and ski on the race course. On the third day, Rowan agreed to sign the release. In exchange for signing the release, Rowan received consideration in the form of Vail's permission for him to continue to use the race course for glide testing. There was consideration and the release is valid, citing *Stroud v. River Runners, Ltd. et al.*, Civil Action No. 97–WY–1561–WD (Order on Motion for Summary Judgment, May 18, 1998).

I find that there was adequate consideration, even though Rowan was asked to sign the release in the middle of the event. In *Stroud*, Judge Downes held that where a release promised a specific person the opportunity to use equipment and services and allowed that person to participate in the event in exchange for the release, adequate consideration was given. I find this opinion persuasive and adopt its reasoning. Here, as in *Stroud*, in exchange for the execution of the release, Rowan was allowed to use the race course for glide testing, *i.e.*, to continue to participate in the event with use of Vail's

facilities. If Rowan had not signed the release, he would have been unable to participate in the testing. Accordingly, I reject Plaintiffs' argument that the release is invalid for lack of consideration.[2]

### c. Whether the Release is Valid under *Jones v. Dressel*

The next issue is whether the release is valid under the four factors articulated by *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981). They include: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Id.* In making this determination, I note that the sufficiency and validity of an exculpatory agreement is a question of law, and turns on the application of Colorado law. *Brooks v. Timberline Tours, Inc.*, 941 F.Supp. 959, 962 (D.Colo. 1996), *aff'd*, 127 F.3d 1273 (10th Cir.1997). Exculpatory agreements have long been disfavored and must be "closely scrutinized." *Id.*; *Dressel*, 623 P.2d at 376. Releases are strictly construed against the drafter. *Brooks*, 941 F.Supp. at 962. With that legal backdrop, I now turn to a discussion of the four relevant factors.

### i. The Existence of a Duty to the Public

Vail argues that the existence of a duty to the public is not a factor in this action. I agree. In order for a release to fail under this factor, the party seeking exculpation must be engaged in providing a service of great importance to the public, which is often a matter of practical necessity. *Jones*, 623 P.2d at 376–77 (quoting *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (Cal.1963)). "It is the essential nature of the service that gives the party seeking exculpation an unfair bargaining advantage and results in the contract running afoul of public policy." *Bauer v. Aspen Highlands Skiing Corp.*, 788 F.Supp. 472, 474 (D.Colo.1992).

**2.** I find *Hoagland* to be distinguishable. There, after the home was completed by the builder, the builder asked the buyers to sign the warranty. There was nothing given in exchange for this warranty, since the home was already completed. Here, in contrast, in exchange for Rowan's execution of the release, Vail agreed to let Rowan continue to perform the glide testing on its race course.

Plaintiffs argue that part of the *Tunkl* analysis, the seminal case relied on by *Jones*, looks to whether the release concerns a business of a type generally thought suitable for public regulation and whether the party holds himself out as willing to perform this service for any person coming within certain established standards. Plaintiffs assert that skiing is regulated through the Ski Safety Act of 1979, Colo.Rev.Stat. § 33–44–101 *et seq.*, and that Vail has historically provided access to glide testing. I agree that skiing is a regulated sport and that Vail may have historically provided access to glide testing. However, the most important thing looked at in connection with the first factor is whether the service is a matter of public importance and of public necessity. I find that the glide testing being conducted by Rowan does not meet this requirement.

Rowan was engaged in skiing not for recreational purposes, but for an even more highly specialized and infrequent use of skiing—to test skis to determine which ones were fastest for use in the World Cup. Although the glide testing benefits both the ski manufacturer and the members of the World Cup who want the fastest skis, that does not make it a matter of great public importance generally. *See Potter v. Nat'l. Handicapped Sports,* 849 F.Supp. 1407, 1409 (D.Colo.1994) (a handicapped skier competing in the National Handicapped Downhill Championships was not participating in a matter of great public importance or a matter of practical necessity); *Bauer,* 788 F.Supp. at 474 (skiing, as a recreational sport, is neither a matter of great public importance nor a matter of public necessity). Further, access to Vail was not a matter of practical necessity for glide testing—there are many other mountains which would have accommodated this glide testing.

**ii. The Nature of the Service Performed**

This factor is linked to the first factor, and Plaintiffs do not address it in their briefs. Vail asserts, and I agree, that skiing is not an essential service. *See Potter,* 849 F.Supp. at 1410 (holding that ski racing for handicapped skiers does not rise to level of essential service); *Bauer,* 788 F.Supp. at 474 (holding that skiing is not an essential ser-

vice). Although the skiing done by Rowan was not recreational in nature because it involved glide testing, I find that such skiing is analogous to ski racing, and does not rise to the level of an essential service required by Colorado law.

**iii. Whether the Contract was Fairly Entered Into**

■ It is undisputed that the release was offered on a "take it or leave it" basis to Rowan. If he did not sign the release, he could not participate in glide testing. However, "printed form contracts offered on a take it or leave it basis, alone, do not render the agreement an adhesion contract .... Rather, there must [be] a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation, or that services could not be obtained elsewhere." *Bauer,* 788 F.Supp. at 474–75. Plaintiffs argue that they can make the requisite showing of unfairness.

First, Plaintiffs assert that Rowan and Vail were greatly disparate in bargaining power. While the skiing in *Bauer* was recreational, Rowan was skiing as part of his work duties. Rowan was directed by his supervisor to assist in the glide testing. The results of the testing were to be used to supply Salomon-sponsored athletes with the fastest skis for the World Cup to be commenced the day following Rowan's death. Further, because of the consistency which is the essence of glide testing, as of the third and final day of testing Rowan and Salomon were committed to completing the glide testing on the same NASTAR course they had been using for the past two days. To switch to any other venue at that point would have rendered the glide tests useless. At the same time, Vail controlled access to possible venues for the testing at Beaver Creek, which was effectively the only area at which such testing could be meaningfully conducted. Vail had Rowan in a box and knew it.

Further, Plaintiffs argue that there was no opportunity for negotiation. Rowan was handed the release and told he "needed to sign [it] before [the testers] could get going for the day." Finally, it is contended by Plaintiffs that the facilities and services which Vail provided literally could not be

obtained elsewhere, since the testing had to be completed at the same venue at which it started. While it may have been possible for Rowan to take his business elsewhere if the releases had been required at the outset, he could not do this on the final day of the glide testing.

In response, Vail asserts that the release was fairly entered into, as evidenced by the release's language which states that Rowan read the release, understood it and signed it with full knowledge of its significance. Further, Rowan had signed releases for at least six years in order to participate in ski races as a member of the United States Ski Association. Rowan had taken a minimum of approximately 20 runs per day on the same race course on the two days prior to signing the release and knew what risks were involved when he signed the release. Vail asserts that releases are commonly used in ski races, as acknowledged by Brown, the other tester. Vail employee Scales testified that Rowan had no hesitation in signing the release, and Rowan could have stopped testing and walked away at any time. Finally, Vail cites the deposition testimony of Scales that even after a close call with the picnic deck, Rowan "didn't feel any changes were necessary [to the picnic deck], that he felt comfortable, that his ability was fine with what they were doing in the testing, that he was comfortable with the test course and the run-out."

Regarding my findings, I think that the release might be valid under this factor if Rowan had been offered the release the first day. At that point, he arguably could have refused to do the glide testing, and chosen to go to a different mountain. Further, if the skiing were recreational in nature only, I don't think that the release would have been entered into unfairly since Rowan could simply have gone somewhere else to ski or chosen not to ski. This case is complicated, however, by the facts that: (1) Rowan was asked to do glide testing as a part of his work; thus, it was not recreational in nature, (2) the testing depends on consistency—the same or very similar conditions must exist during the testing; and (3) Rowan was asked

to sign the release in the middle of the glide testing.

After careful consideration of the issue, I find that the release is invalid under this factor, because it was not entered into fairly. I believe that the fact that Rowan was assigned to do this testing as a part of work, not as a part of recreation, means that the element of choice normally present in signing a release was absent. In other words, this was not a situation where Rowan could choose not to sign the release without any consequences other than an inability to participate in the event. Instead, if Rowan chose not to sign the release, this could have impacted his employment or his standing with his employer. This, in my opinion, shows a high disparity in the bargaining power between Vail and Rowan.

The lack of choice in connection with the release and the disparity in bargaining power is exacerbated by the fact that Rowan was given the release without any chance for negotiation on the final day of testing, when Vail knew that the testing needed to be completed on the same or similar conditions (*i.e.*, conditions at Beaver Creek or Vail), in order for the testing results to be valid. Further, Vail knew that the World Cup was to commence shortly after the testing was completed. Therefore, the services regarding the glide testing simply could not be obtained elsewhere. Finally, the release was offered to Rowan only after Vail was put on notice of several close calls that the testers had with the picnic deck, including notice of an actual injury to tester Tal Klein as she maneuvered to avoid hitting the deck. Although Vail argues that the release was part of its standard procedure, and that it simply forgot to have the release signed the first two days, this is not supported by the evidence. Vail was unable to provide proof of such a policy or any other releases that it has ever had anyone sign in connection with glide testing. Accordingly, I find that the release is invalid because it was entered into unfairly.

#### iv. Whether the Release is Clear and Unambiguous

My conclusion that the release is invalid is buttressed by the fact that I also

find the release to be ambiguous. Whether a contract is ambiguous is a matter of law for the Court to decide. *Anderson v. Eby,* 998 F.2d 858, 861 (10th Cir.1993). "If the plain language of the waiver is clear and unambiguous, it is enforced as a matter of law." *Id.* "If the plain language is unclear or unambiguous, it is void as a matter of law." *Id.* "Thus... courts are not permitted to look beyond the plain language of the waiver." *Id.*

Vail argues, and I agree, that Rowan voluntarily signed the release after being given an opportunity over the first two days of glide testing to observe and sample the course conditions. I further agree that the release is free from legal jargon, not inordinately long and complicated, and the decedent was advised that there were risks associated with the activity that could lead to injury or death. Vail asserts that similar language has been held unambiguous, citing *Heil Valley Ranch v. Simkin,* 784 P.2d 781 (Colo.1989) and other cases.

Nonetheless, I agree with Plaintiffs that the release is ambiguous. The document releases "any and all claims I might state" (emphasis added). Later, in paragraph 5, the release states that it is binding on Rowan's estate and heirs. However, claims "I" might state are, by necessity, limited to those of the signatory, Perry Rowan. A wrongful death action is not encompassed by such language, since Rowan could not assert such a claim on his own behalf. Instead, a wrongful death claim is an independent action belonging to Rowan's heirs. Accordingly, I find the release to be ambiguous as to whether it applies to a wrongful death action.

I also agree with Plaintiffs that the release is ambiguous because there is a conflict between the release's language and the Ski Safety Act as to what risks are assumed. The release first recites the risks being assumed in the broadest possible language when it states, "I expressly assume all risk associated with participating in or training for the event, including without limitations, using ski lifts." The next paragraph of the release then addresses assumption of the risk in terms of the "inherent risks and dangers of skiing" as defined in the Ski Safety Act.

The two paragraphs are ambiguous when read together because they set out a different standard of the risk. The ambiguity is made apparent by the fact that paragraph 1 of the release purports to release Vail from "all risks... including ... using ski lifts." Paragraph 2, which refers to the Ski Safety Act's statutory definition of "inherent dangers and risks of skiing" directly conflicts with this, since the Act explicitly *excepts* from that definition "liability of the ski area operator for injury caused by the use or operation of ski lifts." Colo.Rev.Stat. § 33–44–103(3.5).

I find that *Riehl v. B & B Livery, Inc.,* 944 P.2d 642 (Colo.App.1997), *rev'd,* 960 P.2d 134 (Colo.1998), is instructive on this issue. In *Riehl,* the Colorado Court of Appeals found a release to be ambiguous when it attempted to release a party from "any liability in the event of an injury" but then referenced a more narrow statute relating to inherent risks of equine activities referenced in Colo. Rev.Stat. § 13–32–229. The court stated:

We conclude that the terms of the Agreement, when read together with § 13–21–119 as referenced therein, create an ambiguity as to whether it was intended to exculpate defendant from liability for all negligent acts, including acts contrary to § 13–21–119, and not foreseeable, or, rather, whether exculpation was intended to extend only to those acts that result in injuries arising from the inherent risks of equine activities that are reasonably foreseeable and consistent with the public policy of the state as expressed in the statute.

*Riehl,* 944 P.2d at 644.

Here, like in *Riehl,* I find it ambiguous as to whether the release intends to exculpate Vail from all claims or rather those claims that result in injuries inherent to skiing under the Ski Safety Act. Although *Riehl* was reversed, it was reversed on a narrow ground not applicable here. That is, the Colorado Supreme Court found that the release was not ambiguous because the statute required that every release agreement limiting liability contain such language. *B & B Livery,* 960 P.2d at 138. Here, by contrast, the Ski Safety Act does not require written contracts or releases to contain the statutory warning

language, only signs and ski lift tickets. Colo.Rev.Stat. § 33–44–107(8)(c). Therefore, by choosing to assert the nonmandatory language, Vail created the ambiguity.

In conclusion, for the reasons stated above, I find the release invalid. Accordingly, Rowan's execution of the release does not bar Plaintiffs from asserting their claims.

### 2. *Whether There Is Evidence Of Willful And Wanton Conduct*

This issue was not raised in the summary judgment motion. However, I address it because there are allegations of willful and wanton conduct made in the Amended Complaint, which the Court granted Plaintiffs leave to file after the summary judgment motion was filed. Further, Plaintiffs raised this issue in their supplemental brief in opposition to the summary judgment motion, and in response, Vail argued that there is insufficient evidence of willful and wanton conduct to go to the jury.

On this issue, I first note that I agree with the Plaintiff that an exculpatory agreement cannot release willful and wanton conduct. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981). In Colorado, "willful and wanton behavior requires 'a mental state of the actor consonant with purpose, intent, and voluntary choice.'" *Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273, 1276 (10th Cir. 1997), citing *Potter*, 849 F.Supp. at 1411. "It is 'conduct which an actor realizes is highly hazardous and poses a strong probability of injury to another but nevertheless knowingly and voluntarily chooses to engage in.'" *Id.*

Construing the evidence in the light most favorable to the Plaintiffs, I find there is sufficient evidence for the claim of willful and wanton conduct to go to the jury. There were several close calls with the picnic deck before Rowan was killed, including a knee injury to a tester who tried to avoid hitting the picnic deck. Vail did not add any protection to the deck, despite the apparent man power and ability to do so. Further, on the third and final day in the middle of the glide testing, with knowledge that the testing had to be completed in the same conditions, Vail made Rowan sign a release as a condition to completion of the testing. Vail knew or

should have known that Rowan had little choice in signing the release, since he was working and was required to complete the glide testing for the upcoming World Cup. After Rowan was killed, Vail claimed that it was "standard procedure" to have releases signed for glide testing, but was unable to produce a single example of same. Under these circumstances, there is sufficient evidence to support a willful and wanton claim.

### 3. *Whether The Colorado Ski Safety Act Bars The Claim Against Vail*

Vail also contends that the negligence/negligence per se claim is barred by the Colorado Ski Safety Act of 1979, Colo.Rev.Stat. § 33–44–101 *et seq.* This Act precludes a ski area from being sued by a skier whose injuries resulted from any of the "inherent dangers and risks of skiing". § 33–44–112. The statute defines one of the inherent dangers and risks of skiing as impact with man-made structures and their components. § 33–44–103(3.5). Vail contends that § 33–44–107(7), relied on by Plaintiffs, which requires the ski area to mark "man-made structures on slopes and terrains which are not readily visible to skiers ... from a distance of at least 100 feet" and to "adequately and appropriately cover such obstructions with a shock-absorbent material," is inapplicable since the picnic deck was readily visible for many of hundreds of yards. In addition, Vail argues that the Plaintiffs' claims are barred because the Ski Safety Act precludes a ski area from being sued when a skier is engaged in or practicing for a competition because this type of skier is held to assume the risk of all course conditions. § 33–44–110.

Plaintiffs argue that the Ski Safety Act does not bar their claims. First, they assert that a violation of one of the specific duties of the ski area operator enumerated in §§ 33–44–106 to 108 constitutes negligence per se to the extent such violation causes injury or death, citing § 33–44–102(2) and *Pizza v. Wolf Creek Ski Development Corp.*, 711 P.2d 671 (Colo.1985). The ski area is negligent per se for a violation of its duties regardless of whether the injury or death was caused by an inherent risk of skiing. One of the duties of ski area operators is to make safe the

man-made structures that exist on its ski slopes, *i.e.,* to "adequately and appropriately cover such obstructions with a shock-absorbent material that will lessen injuries." § 33–44–107(7). Plaintiffs argue that Vail's argument that it has a duty only to pad those objects which are not readily visible from 100 feet is not supported by the plain language of the statute or the common practice of ski areas such as Vail and Beaver Creek. Instead, Plaintiffs assert that the ski area has the duty to adequately cover all man-made structures.

Plaintiffs also argue that, even if the Court finds that Vail did not have a statutory duty to pad the deck, an unprotected deck located immediately at the bottom of a ski racing course does not constitute an inherent and integral risk of skiing so as to bar Plaintiffs' claims, citing *Graven v. Vail Associates, Inc.,* 909 P.2d 514 (Colo.1995) and *Clover v. Snowbird Ski Resort,* 808 P.2d 1037 (Utah 1991). Finally, Plaintiffs argue that Rowan was not a "competitor" and the glide testing was not a "competition" under the Ski Safety Act so as to bar Plaintiffs' claims.

■ I find, first, that Rowan was not a "competitor" engaged in "competition" pursuant to Colo.Rev.Stat. § 33–44–110 such that Rowan should be held to have assumed the risk of his injuries. "Competitor" is defined as "a skier actually engaged in competition or in practice therefor with the permission of the ski area operator on any slope or trail or portion thereof designated by the ski area operator for the purpose of competition." § 33–44–103(2). Here, Rowan was not engaged in competition or in practice therefor—he was glide testing skis at the request of his employer, a ski manufacturer. Further, he was not practicing for any competition—he was not planning to race in the World Cup. He was only testing skis for use of racers who would compete in that race. Thus, this section of the Act does not bar Plaintiffs' claims.

■ Next, I reject Plaintiffs' argument that Vail is negligent per se pursuant to Colo.Rev.Stat. § 33–44–107(7). It is true, as Plaintiffs, assert, that a ski area operator is liable for a violation of duties under § 33–44–107(7). *See* § 33–44–103(3.5) (" 'inherent

dangers and risks of skiing' do not include the negligence of a ski operator as set forth in section 33–44–104(2)"); § 33–44–104(2) ("[a] violation by a ski area operator of any requirement of this article ... shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of such operator"). However, I find as a matter of law that Vail did not violate any duties under § 33–44–107(7), which reads:

> The ski area shall mark hydrants, water pipes, and all other man-made structures on slopes and terrains which are not readily visible to skiers under conditions of ordinary visibility from a distance of at least 100 feet and shall adequately and appropriately cover such obstructions with a shock-absorbent material that will lessen injuries. Any type of marker shall be sufficient ... if the marker is visible from a distance of 100 feet and if the marker itself does not constitute a serious hazard to skiers.

*Id.*

I find that under this section, Vail is only required to pad man-made structures not readily visible from a distance of at least 100 feet. The second part of the first sentence, requiring Vail to "cover such obstructions with a shock-absorbent material" clearly refers to the obstructions referenced earlier, namely, "man-made structures which are not readily visible to skiers under conditions of ordinary visibility from a distance of at least 100 feet". This is shown by the Colorado legislature's use of the term "such structures." The only reading of the word "such" is that it must modify "structures" to include only those referenced earlier, *i.e.,* those not visible from 100 feet. If the statute had used the word "all" structures or deleted the word "such", the statute might be ambiguous. However, as written, I don't think that it is ambiguous or that Plaintiffs' reading of the statute has merit. Since the statute is not ambiguous, extrinsic evidence of the practice of the ski area operators is not relevant. Accordingly, Plaintiffs cannot prevail on the summary judgment motion by arguing that Vail breached any duty under that statute.

Finally, I must determine whether Rowan's injury and death resulted from any of the "inherent dangers and risks of skiing" such that Plaintiffs' negligence/negligence per se claim is barred. Colo.Rev.Stat. § 33–44–112 bars "any claim against any ski area operator for injury resulting from any of the inherent dangers and risks of skiing." § 33–44–103(3.5) defines "inherent risks and dangers of skiing" to include "impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, *other man-made structures and their components* . . . ." (emphasis added). Vail's argument that the statute clearly covers impact with man-made structures as an inherent danger and risk of skiing seems, from a simple reading of the statute to be meritorious. However, I think that the Tenth Circuit's opinion in *Graven* and the Utah Supreme Court's analysis in *Clover,* a case relied on by *Graven,* require this Court to go beyond the simple language of the statute and conduct a more detailed inquiry into this issue.

In *Graven,* the plaintiff suffered injuries when he plunged 45 feet down an unmarked steep ravine or precipice and collided with trees. The plaintiff alleged that he had come to a stop in some slushy slow on the ski run, lost his footing, and plunged down the ravine which was "immediately next to" the ski run. The district court and court of appeals granted summary judgment for the defendant on the basis that slush, trees and ravines were clearly defined as inherent dangers and risks of skiing pursuant to § 33–44–103(3.5). The Colorado Supreme Court reversed. The court disagreed with the analysis that because slush, terrain variations and trees were implicated in the plaintiff's skiing accident and were included in the statutory definition of "inherent dangers and risks of skiing," plaintiff's injuries must as a matter of law have arisen from an inherent danger and risk of skiing such that plaintiff's claims were barred. *Graven,* 909 P.2d at 519.

In that regard, the Colorado Supreme Court held that the prefatory language of the definition of "inherent dangers and risks of skiing" must be taken into account, that is, the court must consider whether the dangers and risks "are an integral part of the sport of skiing" and "[t]he detailed listings of dangers and risks must be read with that intent and limitation in mind." *Id.,* citing *Clover.* The Supreme Court concluded on this issue:

> Not all dangers that may be encountered on the ski slopes, however, are inherent and integral to the sport, and this determination can not always be made as a matter of law. In the present case, the plaintiff describes the terrain that precipitated his injuries as a steep ravine or precipice immediately next to the ski run. This description conjures up an image of a highly dangerous situation created by locating a ski run at the very edge of a steep dropoff. If such a hazardous situation presents an inherent risk of skiing that need not be marked as a danger area, the ski area operator's duty to warn under section 33–44–107(2) is essentially meaningless. Therefore, we do not construe section 33–44–103(3.5) to include such a situation within the inherent dangers and risks of skiing as a matter of law.

*Clover* is even more pertinent to this case. There, the plaintiff was injured when another skier jumped over a dropoff which blocked sight of skiers below the jump. 808 P.2d at 1039. The jump was made despite a sign instructing skiers to ski slowly at this point in the run. *Id.* The Utah Inherent Risk of Skiing Statute, similar to the Colorado statute, barred claims associated with injuries from "inherent risks of skiing." *Id.* at 1044. "Inherent risks of skiing" under the statute included "variations or steepness in terrain" and "collisions with skiers," clearly the causes of the injury in that case. The trial court dismissed the plaintiff's claims, holding that the statute, on its face, barred them. In reversing the trial court, the Utah Supreme Court rejected the defendant's argument that the statute must be read as defining all collisions between skiers as inherent risks, stating, "[t]o the contrary, the dangers listed in [the statute] are modified by the term 'integral part of the sport of skiing.' " *Id.* at 1044. "Therefore, ski area operators are protected from suits to recover for injuries caused by one or more of the dangers listed [in the statute] only to the extent that those dangers, under the facts of each case, are integral aspects of the sport of skiing." *Id.*

The Utah Supreme Court in *Clover* defined "inherent risks of skiing," using the ordinary and accepted meaning of the term, to "refer[ ] to those risks that are so integrally related to skiing that the sport cannot be undertaken without confronting those risks." *Id.* at 1047. In other words, "[t]he inherent risks of skiing are those dangers that skiers wish to confront as essential characteristics of the sport of skiing or hazards that cannot be eliminated by the exercise of ordinary care on the part of the ski area operator." 808 P.2d at 1046–47. In considering whether the danger at issue there was an integral part of skiing, the Utah Supreme Court recognized that ski area operators had certain prescribed duties under the statute; however, it held that this did not mean "that a ski area operator is under no duty to use ordinary care to protect is patrons." *Id.* at 1047. "In fact, if an injury was caused by an unnecessary hazard that could have been eliminated by the use of ordinary care, such a hazard is not, in the ordinary sense of the term, an inherent risk of skiing and would fall outside of [the statute]." *Id.* The Utah Supreme Court concluded that genuine issues of material fact existed as to whether the collision was an inherent risk of skiing. *Id.* at 1048. This was based on evidence that "Snowbird was aware that its patrons regularly took the jump, that the jump created an unreasonable hazard to skiers below the jump, and that Snowbird did not take reasonable measures to eliminate the hazard." *Id.* at 1048.

Based on the foregoing authority, I find that there are disputed issues of material fact as to the applicability of the Ski Safety Act. First, I question whether a picnic deck at the bottom of a race course is an integral part of skiing, *i.e.,* whether the sport could not be undertaken without confronting this risk. *Clover,* 808 P.2d at 1046–47. Although the statute does refer to impact with "manmade" objects, the objects that it lists as examples appear to be integral to skiing, *i.e.,* lift towers, signs, posts, fences, hydrants, water pipes, all of which the ski area operator must have in order for the ski resort to function. I think a reasonable jury could find that a picnic deck might not fall within this category. *Graven* also supports this finding. A picnic deck located at the bottom

of a race course which required the skiers to turn sharply to avoid it "conjures up an image of a highly dangerous situation" created by Vail such that there are genuine issues of material fact on this issue. *See id.,* 909 P.2d at 520.

Further, like in *Clover,* I think there are disputed issues of material fact about whether the picnic deck's hazard could have been eliminated by the exercise of reasonable care on the part of Vail. There is evidence that Vail did not pad the picnic deck, that it knew that there were several close calls with the picnic deck before Rowan was killed, and that it was on notice of the potential hazard of the deck. In fact, the evidence, construed in the light most favorable to Plaintiffs, is that Vail asked Rowan and the other testers whether they wanted padding on the deck and that Vail made the testers sign a release on the third day of the testing as a result of this knowledge.

Consequently, I find that Plaintiffs have succeeded in creating a genuine issue of material fact as to whether the impact with the picnic deck was an "inherent danger and risk of skiing" under C.R.S. § 33–44–103(3.5). Vail's motion for summary judgment is therefore DENIED on this issue.

### 4. *Whether Perry Rowan Assumed The Risk*

Vail's final argument as to Plaintiffs' negligence claim is that it is barred by Rowan's assumption of the risk. Vail argues both that there is an express and an implied assumption of the risk. I address each issue separately.

As to express assumption of the risk, Vail argues that Rowan expressly assumed the risk of injury based on his execution of a release. This argument is premised on the release which I found invalid. Accordingly, I DENY Vail's summary judgment motion based on this issue.

■ As to implied assumption of the risk, Vail argues that Colorado recognizes the survival of assumption of the risk as a tort defense in a comparative negligence system. Vail cites Colo.Rev.Stat. § 13–21–111.7; *Knight v. Jewett,* 275 Cal.Rptr. 292, *review*

*granted and opinion superseded,* 278 Cal. Rptr. 203, 804 P.2d 1300 (Cal.1991), *aff'd,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992); *Smith v. City and County of Denver,* 726 P.2d 1125 (Colo.1986) and *Burchinal v. Gregory,* 41 Colo.App. 490, 586 P.2d 1012 (1978) for the proposition that where the danger is readily apparent and the plaintiff chooses to engage in the activity, no duty exists on the part of the defendant.

In *Smith,* the court held that no duty existed as a matter of law between a landowner and a plaintiff who sustained injuries as a result of diving into a natural pool, since "[d]iving from boulders into a river in its natural state obviously creates a high potential for injury." 726 P.2d at 1127. Similarly, in the case at hand, Vail argues that glide testing presents a high risk of injury and that Rowan voluntarily undertook such testing. Rowan knew about the picnic deck and stated that padding was not necessary. Further, he acknowledged and assumed the risks in the release.

■ I agree with Plaintiffs that implied assumption of risk does not amount to a total defense to an action based on negligence. In *Del Bosco v. U.S. Ski Assoc.,* 839 F.Supp. 1470, 1476 (D.Colo.1993), Judge Carrigan held that "[i]n the absence of an express assumption of the risk by contract, an assumption of risk does not necessarily serve as a total bar in comparative negligence cases." 839 F.Supp. at 1476. In this case, since I previously found that there was no express assumption of the risk because the release was invalid, I conclude that the defense of implied assumption of the risk needs to be decided by the jury when it apportions negligence. This finding is in accord with the statute which states "[a]ssumption of the risk by a person *shall be considered by the trier of fact in apportioning negligence* pursuant to Section 13–21–111." Colo.Rev.Stat. § 13–21–111.7 (emphasis added).

I also note that Judge Carrigan distinguished the *Knight* case relied on by Vail because, there, the defendant owed no duty to the plaintiff. The *Smith* case relied on by Vail also found that no duty existed to the plaintiff. Here, I think there are genuine issues of material fact in connection with the

Ski Safety Act and the cases interpreting same as to whether Vail owed a duty to Rowan to correct known hazards and whether it breached such duty. Accordingly, I DENY Vail's summary judgment motion on this issue.

### B. *SALOMON S.A.'S MOTION FOR SUMMARY JUDGMENT*

At issue in this motion is whether SSA was the statutory employer of Perry Rowan pursuant to Colo.Rev.Stat. § 8–41–401 such that Plaintiffs are barred under the Workers' Compensation Act from pursuing their claim against SSA. SSA is a corporation created and existing under the laws of France and is the parent corporation of Salomon North America, Inc. ("SNA"). SSA chooses SNA's officers and directors and is involved in the budgetary process of SNA.

SNA was Perry Rowan's employer at the time of the accident. SNA provides technical support for ski racers from the United States and Canada who use Salomon equipment, and SSA provides technical support on behalf of European skiers. When international races take place in North America, SSA depends on SNA to arrange the glide testing, select and set a course, and provide the testers. This is true even though European skiers may be involved in the race. The corollary is that when international races take place in Europe, SSA arranges the glide testing, even when North American skiers are involved.

It is undisputed in this case that SNA arranged for the glide testing at issue and that either SNA, or Perry Rowan as its employee, was responsible for setting up the testing. Plaintiffs admit this, but allege that there was an overlap in the technical support since two of SSA's employees were present at the glide testing at issue and the testing was to benefit competitors in the World Cup from both North America and Europe. Plaintiffs also argue that although SNA made the arrangements for the glide testing to take place, it did not conduct the actual glide testing itself. The glide test unit belonged to SSA. Finally, SSA asserts, and Plaintiffs dispute, that SSA sets SNA's oper-

ating budget and determines and funds the Racing and Promotions Department Budget for SNA. However, Plaintiffs provide no actual evidence to dispute the evidence provided by SSA in this regard (Schaffner's affidavit).

Finally, it is undisputed that SNA provided worker's compensation benefits to Rowan's parents. Schaffner's affidavit offered by SSA in support of its motion asserts that if SNA did not arrange, set and run the glide testing program at Beaver Creek, SNA would have had to use its own employees to do so. Plaintiffs dispute this, saying there is an inadequate foundation in the affidavit. However, they offer no evidence to contradict the affidavit.

The issue thus presented by this motion is whether SSA is the "statutory employer" of Rowan pursuant to Colo.Rev.Stat. §§ 8–41–102 and 401(1)(a). § 8–41–102 gives "[a]n employer who has complied with the provisions of articles 40 to 47 of this title" immunity from "provisions of section 8–41–101." It further states that "liability for the death of or personal injury to the employer...; and all causes of action .... and statutory and common law rights and remedies for and on account of such death or personal injury to any such employee accruing to any person are abolished except as provided in said articles." § 8–41–401(1)(a) provides:

> Any person, company, or corporation operating or engaged in or conducting any business by leasing or contracting out any part or all of the work thereof to any lessee, sublessee, contractor, or subcontractor...shall be construed to be an employer as defined in articles 40 to 47 of this title and shall be liable...to pay for compensation for injury or death resulting therefrom to said lessees, sublessees, contractors, and subcontractors and their employees or employees' dependents....

Thus, if SSA is the statutory employer of Perry Rowan, Plaintiffs' exclusive remedy against SSA is the Workers' Compensation Act, and the claims asserted against Salomon are subject to dismissal.

Plaintiffs deny that SSA was the statutory employer of Rowan because the cases construing this section require an express or implied contract of hire which they contend is absent in this case. Further, Plaintiffs contend that SSA, as the parent company, is not immune from liability for its own negligent acts unless it can show that SSA and SNA are alter egos. Finally, Plaintiffs argue that the applicable section of the Workers' Compensation Act is the loaned employee section, when one company "loans" one of its employees to another company. Colo.Rev. Stat. § 8–41–303. Here, Plaintiffs argue there is no "contract of hire" between Rowan and SSA, and that, accordingly, SSA, as the borrowing company, is not immune from suit.

I find that the alter ego theory is not applicable in this case. SSA acknowledges that the parent company is generally liable for its own negligent acts unless it is the alter ego of the subsidiary. However, it is not contending that SSA and SNA are alter egos, thus, it is not relying on this theory of immunity.

■■■ As to the loaned employee doctrine, although SSA makes no argument that Rowan was a loaned employee, I believe this issue must be addressed insofar as it may preclude application of the statutory employee doctrine. The "loaned employee" statute, C.R.S. § 8–41–303, provides as follows:

> Where an employer ... loans the service of any ... employees ... to any third person, the employer shall be liable for any compensation thereafter for any injuries or death of said employee as provided in said articles, unless it appears from the evidence in said case that said loaning constitutes a new contract of hire, express or implied, between the employee whose services were loaned and the person to whom the employee was loaned.

Cases construing this section have held that absent a contract, express or implied, or the creation of a special employment relationship between the employee and the borrowing company as evidenced by a contract and/or control of the employee, the employee remains employed by the company loaning the employee, and the borrowing company is not immune from suit under the Worker's Compensation Act. *See Continental Sales Corp. v. Stookesberry,* 170 Colo. 16, 459 P.2d

566, 569 (Colo.1969). However, if there is a contract of hire and/or control of the employer by the borrowing employer, there is "dual employment" and both the loaned and the borrowing employer are immune from suit under the Workers' Compensation Act. *Evans v. Webster,* 832 P.2d 951 (Colo.App.1991), *cert. denied* (1992).

Turning to the facts of this case, on the one hand SSA agrees, for purposes of the motion, that the testing was being performed by and for the benefit of SSA, and that SSA may have had some control in supervising Rowan's performance during the glide testing. On the other hand, SSA contends that the facts as brought out in the motion reveal that when international races take place in North America, SSA depends primarily on SNA to arrange the glide testing at the ski areas, select and set a course, and provide the testers. SNA has the contacts with American ski coaches and ski areas necessary to arrange such glide testing, SNA provides personnel to conduct the glide tests, SNA pays for the glide testing from its racing and promotions budget, and SNA arranged the glide testing at issue in Beaver Creek pursuant to such an arrangement. Further, Plaintiffs admit that Schaffner, an employee of SNA, assigned Rowan the duty of setting up the glide testing, that SNA provided the transportation to the glide testing and paid his expenses and salary, that Rowan was never a member of the glide testing unit, that Schaffner was his immediate supervisor who ordered him to set up the course and do the glide testing, and that Rowan was going to continue working for Schaffner and SNA after the glide testing.

I find that Rowan was not "loaned" to SSA within the meaning of the statute. Although SSA may have supervised the glide testing itself, SSA relied on SNA, not Rowan individually, to arrange the glide testing, who in turn used its own employee, Rowan, for the testing. In other words, Rowan was still working for SNA, not SSA, while doing the glide testing. Accordingly, the loaned employee section of the statute does not appear to be applicable—the "contract," if at existed at all, was between SNA and SSA for the glide testing, not between Perry Rowan and

SSA. In any event, even if the loaned employee doctrine were applicable, I don't think that it would preclude application of the statutory employer doctrine. Thus, I must next address that statute.

Under the statutory employer doctrine, "[a]lthough a given company might not be a claimant's employer as understood in the ordinary nomenclature of the common law, it nevertheless might be a statutory employer for workers' compensation coverage and immunity purposes." *Finlay v. Storage Technology Corp.,* 764 P.2d 62, 64 (Colo.1988). The purpose of the statute "is to prevent employers from avoiding responsibility under the workers' compensation act by contracting out their regular work to uninsured independent contractors." *Id.* The section "was not intended to permit double recovery." *Id.* "If a subcontractor 'has obtained insurance [its employee] cannot reach "upstream" to [the general contractor] to establish tort liability; [the general contractor] is immune from suit . . . .' " *Id.*

Although the statutory employer statute does not expressly include or refer to parent/subsidiary relationships, *Peterson v. Trailways, Inc.,* 555 F.Supp. 827 (D.Colo. 1983) and *Gaber v. Franchise Services, Inc.,* 680 P.2d 1345 (Colo.App.1984) make clear that this statute may apply to such a relationship. *See also Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655 (6th Cir.), *cert. denied,* 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979). However, those cases are distinguishable from this case because there, an employee of a subsidiary sued a parent company not for acts that occurred while working for the parent, but for independent acts of negligence of the parent in connection with its control over working conditions of the subsidiary. Here, Rowan's heirs are suing the parent for its own acts of negligence that occurred while Rowan was undisputedly working for it. Nonetheless, I agree with SSA that it may rely on the statutory employee doctrine if the facts support application of the statute.

Relevant to this analysis, the Colorado Supreme Court in *Finlay* stated:

The test for whether an alleged employer is a 'statutory employer' under . . . the

workers' compensation act is whether the work contracted out is part of the employer's 'regular business' as defined by its total business operation. In applying this test, courts should consider the elements of routineness, regularity, and the importance of the contracted service to the regular business of the employer.

*Id.* at 67. The "importance of the disputed service to the alleged employer's total business operation ... can be demonstrated by showing that in the absence of a subcontractor's services, the contractor would find it necessary to accomplish the work by use of the contractor's own employees rather than to forego the performance of the work." *Id.*

Plaintiffs do not appear to dispute that the glide testing being performed by Rowan was part of SSA's "regular business." Indeed, I don't see how it could not be since SSA is a ski manufacturer and must, as such, test its skis to determine how fast the skis are and which skis are best for what type of terrain. Accordingly, I think this component of the statutory employer statute has been met. Further, SSA has presented evidence that in the absence of SNA arranging the glide testing and providing one of its employees for same, SSA would have to accomplish the work by use of its own employees rather than to forego the performance of the work. Although Plaintiffs argued at the motions hearing that independent contractors are generally used for the testing instead of employees, there is no evidence in the record to support this assertion.

Thus, the key issue is whether there was a contract, express or implied, between SSA and SNA relating to this work. Plaintiffs make much of the fact that there was no written contract. However, an oral contract has been held to suffice. *Pioneer Construction Co. v. Davis*, 152 Colo. 121, 381 P.2d 22, 23 (Colo.1963). Plaintiffs also argue that there is no evidence of an implied contract. SSA disagrees. It asserts that the implied contract was that when the World Cup races took place in North America, SNA would be responsible for the procurement, set up of the glide test locations and finding of participants to glide test the skis. Conversely, when the World Cup races were held in Europe, SSA would arrange for and perform the glide testing, including glide testing for North American athletes. SSA argues that the agreement provided all of the essential elements to form a contract. There was legal consideration in the form of the assignment of funds to SNA's budget for these expenses and also the mutual and reciprocal agreement of SSA to test for North American athletes on behalf of SNA. Under the agreement, both companies received benefits and were under obligation to perform.

I find that SSA has shown the existence of an implied contract. In reaching this decision, I note that I have located no cases that find a contract to exist between a parent and a subsidiary such that the parent was held to be the statutory employer. In fact, the Sixth Circuit in *Boggs* provides a good explanation of why a careful analysis of the issue needs to be undertaken when it held that a "functional relationship between a parent and a subsidiary is not a contract." 590 F.2d at 661. The Sixth Circuit, in declining to find a contract between the parent and subsidiary in *Boggs*, based this holding on the fact that "[t]he expectation of the parties are not based on mutual promises, consideration or consent, for one party owns and has custody of the other party." *Id.* However, this Court in *Peterson* noted that a contract may exist in this jurisdiction between a parent and a subsidiary company, even though it found that one did not exist under the facts of that case. 555 F.Supp. at 835 ("Colorado case authority does not appear to posit a theoretical bar to contractual relations between dominant and dependent entities").

I find this case to be distinguishable from *Boggs* and *Peterson*. Unlike those cases, there was a mutuality of obligation—*i.e.*, in exchange for SNA's arrangement of glide testing in North America, SSA would arrange for glide testing in Europe. Such glide testing would benefit North American skiers, the customers of SNA, who skied in European races. Further, SNA was provided funds out of SSA's budget for this arrangement. This does not appear to be a case of functional dependency, where SNA was required to perform the task simply because SSA exercised control over it. Fur-

ther, the mutuality of obligation described above defeats Plaintiffs' argument that there was no consideration for the contract—SNA was both provided funds out of the budget for this arrangement and received consideration in the form of SSA's reciprocal obligation to arrange for glide testing in Europe.

Accordingly, I find that SSA is the statutory employer of Rowan. As such, it is immune from suit by the Plaintiffs pursuant to Colo.Rev.Stat. § 8–41–401(1)(a). Salomon, S.A.'s motion for summary judgment is thus GRANTED.

## IV. CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, it is

ORDERED that Vail Holdings, Inc., Vail Associates, Inc. and Beaver Creek Associates, Inc.'s Motion for Summary Judgment filed November 21, 1997, accepted for filing on December 5, 1997, is DENIED. It is

FURTHER ORDERED that Defendant Salomon S.A.'s Motion for Summary Judgment filed on February 3, 1998 is GRANTED, and Salomon S.A. is DISMISSED from this action.