**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 12, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FABIAN MALDONADO PINEDO,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee,

and

JON MARTINSON, JR.,

    Defendant - Appellant.

No. 19-4004
(D.C. No. 2:14-CV-00723-TC)
(D. Utah)

_____

FABIAN MALDONADO PINEDO,

    Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee,

and

JON MARTINSON, JR.,

    Defendant.

No. 19-4013
(D.C. No. 2:14-CV-00723-TC)
(D. Utah)

_____

# ORDER AND JUDGMENT[*]

_____

Before **PHILLIPS**, **BALDOCK**, and **MORITZ**, Circuit Judges.

_____

In these appeals, we review a district court's order denying a federal immigration agent's "Westfall petition."[1] The district court ruled that the government was not obliged to substitute itself as a party defendant in the place of the agent who injured an immigration detainee. After an evidentiary hearing, the district court made detailed fact findings and applied them to Utah's legal framework for assessing whether an employee has acted within his scope of employment. From this, the district court concluded that the federal agent had acted outside the scope of his employment by his unjustifiably injuring the detainee. We affirm.[2] Additionally, we dismiss for lack of jurisdiction the

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), "relieve[s] covered employees from the cost and effort of defending [a] lawsuit and . . . place[s] those burdens on the Government" by "immuniz[ing] covered employees not simply from liability, but from suit." *Osborn v. Haley*, 549 U.S. 225, 228–29, 238 (2007); *see* discussion *infra* Background Part V.

[2] We have jurisdiction to hear this interlocutory appeal under 28 U.S.C. § 1291 because the district court's final order is a "reviewable final decision" under the collateral-order doctrine. *Osborn*, 549 U.S. at 238; *see also Woodruff v. Covington*, 389 F.3d 1117, 1125 (10th Cir. 2004) (citation omitted).

detainee's separate appeal seeking the same relief—our reversal of the district court's denial of the agent's Westfall petition.

## BACKGROUND

### I. The District Court's Evidentiary Hearing and Fact Findings

In July 2018, a district court in Utah held an evidentiary hearing to determine whether an Immigration Enforcement Agent had acted within his scope of employment when injuring a fully shackled detainee in federal custody. *Pinedo v. United States*, No. 2:14-CV-723-TC, 2018 WL 6331808, at \*1 (D. Utah Dec. 4, 2018). In this hearing, the district court heard testimony from seven witnesses—Agent Jon Martinson Jr., three other Immigration Agents who witnessed the injury, each side's expert witness, and the detainee, Fabian Maldonado-Pinedo (Maldonado).[3] *Id.*; Appellant's App. vol. 1 at 69, vol. 2 at 295. It also viewed a video recorded at the facility, which captured much of Agent Martinson's and Maldonado's conduct. *Pinedo*, 2018 WL 6331808, at \*2. After that, the district court issued a thorough order, detailing the hearing testimony and making fact and credibility findings before concluding that the agent had acted outside the scope of his employment.

---

[3] In April 2018, after bifurcating the Westfall Act issue from trial, the district court held a hearing to resolve this issue, but ultimately determined that it needed an evidentiary hearing to resolve genuine issues of material fact. The court noted that the facility's video "did not definitively show what occurred." *Pinedo*, 2018 WL 6331808, at \*2.

We review the district court's fact findings for clear error. *See Curry v. United States*, 97 F.3d 412, 414 (10th Cir. 1996) (reviewing the district court's factual findings for clear error in a Federal Torts Claims Act case); *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993) ("Where facts relevant to [a Westfall Act] inquiry are in dispute . . . we review the district court's factual findings for clear error." (footnote and citation omitted)). Here, the district court's fact findings are not clearly erroneous and, in fact, are well supported by the record.[4] And our "[d]eference to the trial court's findings is at its greatest when those findings are based on determinations regarding witness credibility." *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 866 (10th Cir. 2005) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). Further, we have

---

[4] Throughout his brief, Agent Martinson claims that the district court ignored his evidence and proposes different fact findings than those entered by the district court. *See, e.g.*, Appellant's Opening Br. 22 (claiming that Agent Martinson did not try to hurt Maldonado, that the takedown was to gain compliance, and that his instincts took over when he felt threatened); *id.* at 29 (saying "[e]ven if it is *assumed, arguendo,* that Martinson intentionally injured the Plaintiff") (emphasis added); *id.* at 32 (claiming that Maldonado repeatedly resisted by pulling his arm away and hesitating in his movements); *id.* at 37 (claiming that Agent Martinson's conduct "comported with ICE policy and his training"); *id.* at 38 (claiming that the district court "ignored evidence testimony" that Maldonado provoked Agent Martinson); *id.* at 39 (claiming the district court ignored evidence that the takedown was not highly unusual and that Maldonado posed a "risk of harm"). As the government notes, this does not suffice to show clear error—in fact, Agent Martinson does not claim that in his brief. Appellee's Br. 21–22. Further, the district court's order shows that it carefully considered the supposedly ignored evidence. Obviously, rejecting that evidence in favor of other evidence does not equal ignoring evidence. *See Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir. 1985) ("The resolution of factual issues and conflicting evidence lies solely within the province of the district court.").

reviewed the record and see that the district court had ample reason for its credibility findings. We now turn to the district court's findings.

## II.     The Incident

On July 3, 2013, Immigration Enforcement Agent Martinson was the team lead at the Decker Lake detention facility in Utah. *Pinedo*, 2018 WL 6331808, at *2. The facility is run by the United States Immigration and Customs Enforcement (ICE). *Id.* Decker Lake does not house immigration detainees overnight. Instead, it processes detainees and returns them to local jails where they await deportation.

Acting according to the facility's protocol, Agent Martinson went to Cell 5 for a routine pre-transport headcount of detainees. *Id.* Upon arriving there, Agent Martinson saw one detainee, Maldonado, standing next to the door. *Id.* Agent Martinson opened the door and told Maldonado to sit down. *Id.* According to Agent Martinson, Maldonado took a "bladed stance" (standing with his feet angled out at 90 degrees) and stared back at him. *Id.* Then Maldonado responded with words to the effect, "What if I don't want to sit down" or "Why do I need to?" *Id.* Ignoring Agent Martinson's commands, Maldonado "slowly circled the center bench with his hands behind his back, looking at Agent Martinson for part of the time as he did so." *Id.* Agent Martinson considered this "mad dogging," which he took as a sign of disrespect. *Id.* Maldonado sat down after Agent Martinson shut the cell door. *Id.*

Because Maldonado's defiant behavior raised several "red flags," Agent Martinson decided to separate Maldonado from the other eight detainees and place him in a separate cell (Cell 1). *Id.* at *3. Agent Martinson was concerned that he might lose control if the other detainees joined in disobeying commands. *Id.* Having decided on this approach, Agent Martinson retrieved latex gloves and called for backup assistance. *Id.* He testified that his "main concern" was safety. *Id.* Accordingly, he intended to fully restrain Maldonado for the thirty-to-forty-foot walk to Cell 1. *Id.* at *3–4. To fully restrain a detainee, an agent shackles the detainee's legs with a chain, places a belly chain around the waist, handcuffs the wrists, and attaches the handcuffs to the belly chain. *Id.* at *3. Applying full restraints to a detainee for a transfer within the building was "very uncommon." *Id.*

Without awaiting the requested backup, Agent Martinson re-opened the cell door and ordered Maldonado outside it. *Id.* Maldonado complied without hesitating or resisting. *Id.* To apply the restraints, Agent Martinson ordered Maldonado to face the wall and kneel on a bench there. *Id.* At first, Maldonado leaned with his arms against the cell window and put only one knee on the bench. *Id.* Agent Martinson testified that before placing his second knee on the bench, Maldonado gave him a "100-yard stare" for several seconds. *Id.* Despite later testifying that his main concern was safety, Agent Martinson turned his back on the unrestrained Maldonado to retrieve leg irons from a cabinet. *Id.* Agent Martinson testified that this was "probably not" the "most prudent

6

action," but he blamed his mistake on being "new" (he had worked at the facility for sixteen months and was team lead that day). *Id.* at *3, *6. After shackling Maldonado's legs, Agent Martinson again turned his back to Maldonado to retrieve the belly chain and handcuffs. *Id.* at *3. As he was putting the handcuffs on Maldonado, three backup agents arrived. *Id.* With these full restraints, Maldonado's range of motion was restricted—he could not raise his arms above mid-chest, and his stride was limited. *Id.* at *4.

Agent Martinson used a "C-Hold" grip on Maldonado's arm—in a "come-along" position—and began escorting him the thirty to forty feet to Cell 1. *Id.* The three backup agents trailed close behind in case something went wrong. *Id.* Agent Martinson testified that during this short walk, he felt Maldonado "kind of tense and flex his arm, and his upper body kind of move away from me." *Id.* Agent Martinson told Maldonado, "don't pull away from me." *Id.* Agent Martinson testified that after taking several more steps, he felt the same movement and warned Maldonado that if Maldonado moved this way again, he would take Maldonado to the ground. *Id.* Agent Martinson told Maldonado, "if you resist I'm going to take you to the ground and it will be very painful I promise you[.]" *Id.* at *4 (alteration in original). A second or two later, about five feet from Cell 1, as one of the backup agents was opening the cell door, Agent Martinson said he felt a similar movement, so he spun Maldonado 270

7

degrees and planted him head-first on the concrete floor.[5] *Id.*, *see also id.* at *9.

From the video, the district court saw Agent Martinson's right hand on the back

of Maldonado's neck and head at impact. *Id.* at *4. The restraints kept

Maldonado from breaking his fall, so his face hit the concrete, rendering him

unconscious, knocking out some front teeth, and requiring stitches to close

wounds to his forehead and the bridge of his nose. *Id.* Agent Martinson testified

that his actions were necessary to protect his own safety and to "[g]ain

compliance" and to "control" Maldonado. *Id.*

### III. The Expert Testimony

During the evidentiary hearing, the district court heard each side's expert

witness testify. The court credited the testimony of the government's expert,

Caleb Vitello, because of his years of experience as an ICE instructor of

defensive tactics and use of force. *Id.* at *5. Among his areas of instruction were

"compliant and noncompliant handcuffing which included throws, takedowns,

and different ways to handcuff individuals who were noncompliant." *Id.* In

contrast, the court gave "little weight" to Agent Martinson's expert, Steven

Branch, whose most-recent experience was managerial and who was not

certified to train agents in defensive techniques. *Id.* at *4–5.

---

[5] The government's expert witness, Caleb Vitello, testified that "it looks to me, from right there on the video, that he is driving [Mr. Maldonado's] head into the ground which is not something that we teach." *Pinedo*, 2018 WL 6331808, at *9 (alteration in original).

At the hearing, expert Vitello testified that a takedown in these circumstances was essentially "unheard of" and "is nothing that we teach, it is nothing that we do, it is nothing that we would agree upon." *Id.* at *5. He testified that ICE's takedown techniques do not apply to persons in full restraints—and, in fact, are designed to take a noncompliant person to the ground to restrain him. *Id.* The court noted that Agent Martinson's takedown as seen on the video "bore no resemblance to the takedown techniques discussed by the parties during the hearing and in photos depicting the 'arm bar takedown' in course curriculum." *Id.* The court agreed that Agent Martinson's action was "highly irregular."[6] *Id.*

Against Agent Martinson's testimony that he was simply trying to maintain control and was not trying to hurt Maldonado, the court considered the testimony of the backup agents, expert Vitello, the video, and "common sense." *Id.* at *6. After doing so, the court found that Agent Martinson was not credible. *Id.* The court noted that despite saying he feared Maldonado, Agent Martinson had twice turned his back on Maldonado outside the holding cell, without awaiting the requested backup agents. *Id.* The court described Agent Martinson's claim that Maldonado posed a threat immediately before the takedown as making "no sense." *Id.* at *7. The court pointed out that Maldonado was fully restrained with three agents mere steps behind on the short walk to

---

[6] Even Agent Martinson's own expert testified that ICE's use-of-force policy does not provide for takedowns on fully restrained individuals.

Cell 1. *Id.* The court found that the threat at that point was "minimal, if any." *Id.* Maldonado had not resisted or had resisted so slightly that it could not justify Agent Martinson's takedown. *Id.* Reemphasizing that Agent Martinson was not credible, the court found that Agent Martinson had not felt threatened at any point, that he had met little if any resistance, and that he had intended to harm Maldonado by throwing him face first to the concrete floor. *Id.* From this, the court found that "Agent Martinson took down Mr. Maldonado based on a 'personal desire to physically punish the detainee for disrespecting authority.'" *Id.*

## IV. Pre-Westfall-Hearing Civil and Criminal Filings

Soon after the incident, the FBI opened an investigation into Agent Martinson's conduct. On June 25, 2014, a federal grand jury sitting in the District of Utah returned a one-count indictment charging Agent Martinson with "slamming [Maldonado] onto the concrete floor face first, willfully depriving him of the rights secured and protected by the Constitution and laws of the United States, to be free from the use of unreasonable force by a law enforcement officer," in violation of 18 U.S.C. § 242. Suppl. App. at 49–50. But the district court dismissed this indictment without prejudice after ruling that the government had mis-instructed the grand jury on the crime's mens rea element.

On October 2, 2014, Maldonado sued ICE, Agent Martinson, Todd McWhorter (the Assistant ICE Field Office Director in the Salt Lake City

10

office), and Steven Branch[7] (the ICE Field Office Director of the Salt Lake City office). Generally, Maldonado's Complaint alleged that Agent Martinson's takedown was an assault and battery under Utah law; that Agent Martinson had acted within the scope of his employment; that the use of force resulted from a policy, practice, or custom of the other defendants to inadequately supervise and discipline ICE agents using excessive force; and that the defendants violated his Fifth Amendment rights "and other constitutional rights." Compl. at 3–4, *Maldonado v. U.S. Immigration & Customs Enf't*, No. 2:14-CV-00723-EJF (D. Utah Oct. 2, 2014).

On March 11, 2015, Maldonado filed a First Amended Complaint, this time suing just the United States and Agent Martinson, in his official and individual capacity. The factual allegations remained the same as in the original Complaint.

On September 23, 2015, a second grand jury sitting in the District of Utah returned a one-count indictment against Agent Martinson on the original charge. In particular, the grand jury charged that Agent Martinson had "willfully deprived [Maldonado] of the right, protected and secured by the Constitution and laws of the United States, not to be subjected to cruel and unusual punishment through the use of excessive force when the defendant maliciously and sadistically threw [Maldonado] to the concrete floor face first, while

---

[7] This is the same person serving as Agent Martinson's expert witness at the evidentiary hearing on the Westfall petition.

11

[Maldonado] was restrained in leg shackles, handcuffs and a waist chain, resulting in bodily injury, in violation of Title 18, United States Code, Section 242." Suppl. App. at 56–57. But on January 27, 2016, the district court dismissed the indictment without prejudice, ruling that the indictment was "defective on its face" for failing to allege that Agent Martinson's conduct was "unnecessary." *Id.* at 22, 58, 62–65. The United States Attorney for the District of Utah then apparently gave up on prosecuting Agent Martinson.[8]

## V.   The Westfall Petition

On December 27, 2016, in response to being sued, Agent Martinson requested that the government certify that he had been acting within the scope of his employment, including while injuring Maldonado.[9] Under the Westfall Act, federal employees receive "absolute immunity from common-law tort

---

[8] Agent Martinson emphasizes that he was not disciplined by ICE and that the criminal charges against him were resolved "favorabl[y]," implying that this is evidence he acted within the scope of his employment. *See* Appellant's Opening Br. 23.

[9] His request concerns Maldonado's assault-and-battery claim, not his excessive-force claim. *See* 28 U.S.C. § 2679(b)(2)(A) (stating that the Westfall Act's protections "do[] not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States"); H.R. Rep. No. 100-700, at 6 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5950; *see also Rodriguez v. Swartz*, 899 F.3d 719, 740 (9th Cir. 2018) ("[T]he FTCA has an explicit exception for *Bivens* claims, allowing them to proceed against individuals. This ensures that federal officers cannot dodge liability for their own constitutional violations by foisting their liability onto the government." (internal quotation marks and citations omitted)), *cert. granted, judgment vacated*, 140 S. Ct. 1258 (2020). !

12

claims arising out of acts they undertake in the course of their official duties."
*Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)).
Before this immunity applies, a federal employee accused of a negligent or
wrongful act or omission must first request that the Attorney General certify that
he was "acting within the scope of his office or employment." 28 U.S.C.
§ 2675(a) (2018); *see also* 28 C.F.R. § 15.4 (2019) (delegating the certification
decision to the United States Attorneys). If this request is certified, then the
United States substitutes itself, as defendant, for that employee. *See* 28 U.S.C.
§ 2679(d)(1). But if, as here, the request is denied, "the employee may at any
time before trial petition the court to find and certify that the employee was
acting within the scope of his office or employment." *Id.* § 2679(d)(3).

In January 2015, because of the ongoing federal criminal proceedings in
Utah, the United States Attorney's Office for the District of Wyoming agreed to
represent the United States in the civil suit. On April 19, 2017, the Acting
United States Attorney in Wyoming considered and denied Agent Martinson's
Westfall petition, concluding that Agent Martinson had acted outside the scope
of his employment when injuring Maldonado.

## DISCUSSION

We review de novo the district court's legal conclusions regarding Utah's
scope-of-employment test. *See Richman v. Straley*, 48 F.3d 1139, 1145 (10th Cir.
1995); *see also Bolton v. United States*, 946 F.3d 256, 260 (5th Cir. 2019)
(concluding that appellate courts review de novo a district court's Westfall Act

13

decision). Evaluating whether Agent Martinson's conduct was within his scope of employment under Utah law takes two steps. First, we must resolve what Utah law requires for an employee to have acted within the scope of his employment. Second, we must apply the district court's facts to that legal framework.

## I.    Utah Law on Scope of Employment

In evaluating Agent Martinson's Westfall petition, we apply Utah's scope-of-employment law. *See Richman*, 48 F.3d at 1145 ("For purposes of the [Westfall Act], 'scope of employment' is defined by the respondeat superior law of the state where the incident occurred." (citation omitted)). In discussing Utah law governing scope of employment, we highlight the two primary cases on that subject: *Birkner v. Salt Lake County*, 771 P.2d 1053 (Utah 1989), and *M.J. v. Wisan*, 371 P.3d 21 (Utah 2016).[10]

---

[10] Agent Martinson also directs us to *Bowman v. Hayward*, 262 P.2d 957 (Utah 1953), a case in which a deputy sheriff assaulted a prisoner who had refused to wash the deputy's personal car. *Id.* at 957. The court concluded that the deputy had done this in his official position and "abused authority wholly derived from the office of deputy sheriff." *Id.* at 959. In part, the court relied on the deputy's "state of mind—the intention to act as an officer." *Id.* at 960. Agent Martinson acknowledges the age of this case, but he contends that it is still good law, cited as recently as *Clark v. Pangan*, 998 P.2d 268 (Utah 2000). But *Clark* cites *Bowman* as part of a lengthy string cite of cases involving the scope-of-employment issue for employees committing intentional torts. *Clark*, 998 P.2d at 270. And *Clark* applies the *Birkner* conditions. *Id.* at 272–73. Notably, in the sixty-seven years since it was decided, only five cases have cited *Bowman*, and none of those relied on its holding. Accordingly, we evaluate Agent Martinson's case according to *Birkner*, not *Bowman*—as have the Utah courts.

14

## A.    *Birkner*

In *Birkner*, Michael Flowers, working as a crisis worker at a county mental-health facility in Salt Lake City, Utah, counseled Cynthia Birkner about difficulties she was having in her life. 771 P.2d at 1055. After about two months of treatment, and before another scheduled treatment session began, "Birkner sat on Flowers' lap and kissed him." *Id.* Once the session ended, they kissed again, and this time Flowers fondled Birkner's breasts. *Id.* The next day, Flowers told Birkner that "he should [not] have engaged in a physical relationship with her," but later that day, after they discussed Birkner's feelings, they again engaged in "conduct that was inappropriate for a social worker under the circumstances." *Id.* The following day, Birkner reported the activity to treatment-center employees. *Id.*

Birkner sued Flowers and Salt Lake County, alleging "sexual battery and negligence against Flowers and claims of negligent supervision and vicarious liability on the part of the County." *Id.* at 1056. The County represented Flowers while reserving its right to argue that Flowers's conduct was outside his scope of employment. *Id.* Later, Flowers's malpractice insurer furnished him an attorney to defend the suit. *Id.* At trial, Flowers admitted the kissing and fondling. *Id.*

During jury deliberations, the County moved for directed verdict on the scope-of-employment issue. *Id.* The district court denied this motion and granted Flowers's cross motion for indemnification. *Id.* After the jury returned its

15

verdict, the court denied the County's motion for judgment notwithstanding the verdict. *Id.* The County filed in the Utah Supreme Court an appeal of the district court's scope-of-employment ruling. *See id.*

The Utah Supreme Court recited the issue as whether Flowers's "improper sexual contact" with his patient fell "within the scope of the therapist's employment." *Id.* Addressing the "basic function that the term 'scope of employment' serves in respondeat superior cases," the court quoted this passage from the leading hornbook on Torts:

> As in the case of the existence of the relation itself, many factors enter into the question: the time, place and purpose of the act, and its similarity to what is authorized; whether it is one commonly done by such servants; the extent of departure from normal methods; the previous relations between the parties; whether the master had reason to expect that such an act would be done; and many other considerations. . . . [I]n general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master.

*Id.* (alterations in original) (quoting W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984)).

With this background, the court turned to the controlling Utah law, noting that "Utah cases have tended to focus on three criteria for determining when the conduct of an employee falls within the scope of employment." *Id.* "*First*, an employee's conduct must be of the general kind the employee is employed to perform." *Id.* at 1056–57 (emphasis added) (citations omitted). By this, the court meant that an "employee's acts or conduct must be generally directed toward the

16

accomplishment of objectives within the scope of the employee's duties and authority, or reasonably incidental thereto." *Id.* at 1057. "In other words, the employee must be about the employer's business and the duties assigned by the employer, as opposed to being wholly involved in a personal endeavor." *Id.* (citation omitted). "*Second*, the employee's conduct must occur within the hours of the employee's work and the ordinary spatial boundaries of the employment." *Id.* (emphasis added) (citations omitted). "*Third*, the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest." *Id.* (emphasis added) (citations omitted). The "employee's purpose or intent, however misguided in its means, must be to further the employer's business interests." *Id.* (citation omitted). In contrast, "[i]f the employee acts 'from personal motives . . . in no way connected with the employer's interests' or if the conduct is 'unprovoked, highly unusual, and quite outrageous,' then the master is not liable." *Id.* (second alteration in original) (citing Keeton, *supra*, at 506).

Addressing the first scope-of-employment condition,[11] the court observed that Flowers's sexual contact with his patient was "not the general kind of

---

[11] Utah courts have used different terms when referring to the three *Birkner* conditions. *See, e.g.*, *Salo v. Tyler*, 417 P.3d, 581, 589 (Utah 2018) (referring to them as "the standard"); *M.J.*, 371 P.3d at 31 (referring to them as factors); *Acor v. Salt Lake City Sch. Dist.*, 247 P.3d 404, 408 (Utah 2011) (referring to them as "criteria"); *Pangan*, 998 P.2d at 272–73 (referring to them as factors, criteria, and "the three-part test"); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1040–41 (Utah 1991) (referring to them as "criteria"); *Birkner*, 771

17

activity a therapist is hired to perform." *Id.* at 1058. Further, the court noted that it is well-established "that sexual activity between therapist and patient is not related to the master's objectives or interests." *Id.* "Indeed, it was specifically forbidden by the policy and procedures manual of the County clinic." *Id.* And Flowers was subject to a licensing rule stating that "[t]he social worker shall under no circumstances engage in sexual activities with clients." *Id.* For these reasons, the court ruled that Flowers could not meet this condition.[12] *Id.*

Addressing the third scope-of-employment condition, the court noted that Flowers's sexual contact "was not intended to further his employer's interest." *Id.* "On the contrary, it served solely the private and personal interests of Flowers." *Id.* Further, the court noted that "Flowers' conduct arose from his own personal impulses, and not from an intention to further his employer's goals." *Id.* "Nor did his conduct in any way, inappropriately or otherwise, further those goals." *Id.* For this reason, too, the court ruled that "Flowers' conduct was outside the scope of his employment as a matter of law." *Id.* at 1059.

---

P.2d at 1056 (referring to them as "criteria"). We refer to the *Birkner* test as conditions, because as we discuss later, an employee's failure to meet any condition places the employee outside of his scope of employment.

[12] The court also found that "Flowers' misconduct took place during, or in connection with, therapy sessions," meeting the second scope-of-employment condition. *Birkner*, 771 P.2d at 1058.

18

**B.**     *M.J.*

Twenty-seven years later, the Utah Supreme Court again had occasion to consider the *Birkner* scope-of-employment test in *M.J.*, 371 P.3d at 30. This case arose out of activity of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS). *Id.* at 22–25. The Church had decades before formed a Trust consisting of property consecrated to it by its members. *Id.* at 23. By the time of the relevant conduct at issue, Warren Jeffs was running the church as its acting president and serving as a trustee and president of the Trust's board of trustees. *Id.* at 24. Within church practice, Jeffs forced M.J., a fourteen-year-old girl, to marry her first cousin. *Id.* In her federal complaint six years later, she sued Jeffs and the Trust for state-tort claims, asserting direct and vicarious liability. *Id.* at 24–25. As her respondeat superior claim against the Trust, M.J. claimed that in forcing her illegal, underage marriage, "Jeffs and other trustees were acting 'in furtherance of the trust administration and within the scope of their authority.'" *Id.* at 25. After the court denied its summary-judgment motions, the Trust filed an interlocutory appeal to the Utah Supreme Court. *Id.* Among other things, the Trust argued that M.J. had not satisfied the elements of respondeat superior liability. *Id.*

In examining whether the Trust could be held liable for the tortious conduct of Jeffs, the court considered the "common law of agency," noting that agency law provided two policy justifications for such liability—(1) the injured party's better likelihood of satisfying a judgment from the employer, and (2) the

employer's being deterred from hiring dangerous employees as well as being encouraged to structure its work to minimize the incidence of tortious conduct. *Id.* at 30. At the same time, the court noted that "fairness considerations also help mark the law's limitations on such vicarious liability." *Id.* For instance, "[w]hen an agent's act occurs within 'an independent course of conduct' not connected to the principal, he is not acting within the scope of employment." *Id.* (citation omitted). The court described "[a]n 'independent course of conduct'" as one "so removed from the agent's duties that the law, in fairness, eliminates the principal's vicarious liability." *Id.* at 31. An independent course of conduct "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls." *Id.* (citation omitted).

After this discussion, the court turned to Utah case law, reaffirming that Utah cases apply the three *Birkner* conditions to determine whether an employee was acting within his scope of employment when committing a tort. *Id.* The court noted some tension between *Birkner* and later legal pronouncements outside of Utah. *Id.* at 32. But it left resolving all but one of these tensions to another day.[13] *Id.* In the one it addressed, the court jettisoned the second *Birkner*

---

[13] For example, the court declined to "choose . . . between the purpose or motive test that the Third Restatement [of Agency] portrays as the majority view and the 'alternative' formulations that it describes." *Id.* at 32–33. And despite Agent Martinson's position, we do not see any error in the district court declining to now make this choice. We note that Agent Martinson did not ask the

20

condition. *Id.* Specifically, the court held "that an agent need not be acting 'within the hours of the employee's work and the ordinary spatial boundaries of the employment' in order to be acting within the course of his employment." *Id.* (quoting *Birkner*, 771 P.2d at 1057).[14]

Turning to *Birkner*'s remaining two scope-of-employment conditions, the court noted that "it cannot be said that Jeffs's acts were an 'independent course of conduct' not intended by Jeffs to serve 'any purpose' of the Trust." *Id.* at 33. Acknowledging that Jeffs's acts appeared "misguided" and that he "may have had his personal interest in mind when he exercised control over trust property to compel M.J. to be submissive to his ecclesiastical authority and remain in her illegal marriage," the court said that it could not "conclude that Jeffs had no purpose of advancing the interests of the Trust (however misguided those interests may seem—as they certainly do)." *Id.* Further, the court noted that trustee Jeffs had been called upon to "administer the Trust in accordance with the doctrines and principles of the FLDS Church"—including "the arrangement of plural, underage marriages." *Id.* From this, the court found a basis in the

_____

district court to certify the scope-of-employment issue to the Utah Supreme Court, but now asks that we do so after he lost in the district court. We decline to certify the question.

[14] As explained, *M.J.* eliminated *Birkner*'s second condition. In view of this, we do not understand Agent Martinson's claim that the district court erred by not applying that condition. And despite the Utah Supreme Court earlier eliminating this second condition, the district court obviously knew and considered that Agent Martinson had performed his unjustified takedown at work.

21

record to conclude that "Jeffs's acts were aimed in part at advancing the interests of the Trust as he perceived them." *Id.* at 33–34. The court affirmed the denial of the Trust's motion for summary judgment after concluding that "Jeffs's conduct was 'of the general kind' he was expected 'to perform' as trustee." *Id.* at 34.

**II.    The District Court Properly Denied Agent Martinson's Westfall Petition Because He Acted Outside His Scope of Employment.**

Because the district court's fact findings resolve the scope-of-employment issue, we begin by repeating some of those findings here for convenience's sake. The district court found these facts: (1) Maldonado initially refused Agent Martinson's commands to sit down in Cell 5; (2) Agent Martinson decided to move Maldonado to Cell 1 and requested backup assistance; (3) Maldonado complied with Agent Martinson's order to exit the cell and to position himself for shackling; (4) Agent Martinson twice turned his back on Maldonado to fetch restraints, first when Maldonado wore no restraints, and again when he had only leg restraints; (5) Agent Martinson did this without awaiting his requested backup; (6) as Agent Martinson finished fully shackling Maldonado—including with a belly chain—the three backup-agents arrived; (7) Agent Martinson led Maldonado toward Cell 1, which was about thirty to forty feet from Cell 5; (8) Maldonado admitted to raising his right shoulder, and Agent Martinson told him if it happened again he would take him to the ground and it would be "very painful I promise you," *Pinedo*, 2018 WL 6221808, at *4; (9) after this warning,

22

Agent Martinson testified that Maldonado moved his arm again, but any movement was so subtle that the surveillance video did not catch it, and the trailing agents saw no resistance; (10) when they were about five feet from Cell 1, as another agent was opening Cell 1's door, Agent Martinson violently threw the fully shackled Maldonado face-first into the concrete floor, with his hand on the back of Maldonado's neck; and (11) doing this left Maldonado unconscious with some front teeth knocked out and bleeding from facial lacerations requiring stitches. From these facts, the district court made these additional determinations: (12) Agent Martinson never feared Maldonado, before or during his thirty-to-forty foot escorted walk to Cell 1; and (13) Agent Martinson threw Maldonado to the cement floor without any safety or compliance concerns, but instead for purely personal motives.

### A. Agent Martinson's Conduct Was Not of the General Kind He Was Employed to Perform.

The district court recited the first *Birkner* condition, noting that "the employee's conduct must be 'generally directed toward the accomplishment of objectives within the scope of the employee's duties and authority, or reasonably incidental thereto.'" *Id.* at *8 (quoting *Birkner*, 771 P.2d at 1057). It further explained that an employer is not liable for an employee's actions "if the employee is 'wholly involved in a personal endeavor[.]'" *Id.* (quoting *Birkner*, 771 P.2d at 1057). The court reasoned that an immigration agent "is hired to process detainees and keep fellow agents and detainees safe while maintaining

23

order at the facility." *Id.* Based on its fact findings—particularly that Agent Martinson's takedown was unprovoked and that he meant to harm Maldonado instead of gaining his compliance or protecting safety—the court ruled that "harming a detainee as punishment is completely outside the bounds of ICE's interests and the duties an agent is hired to perform." *Id.* On this same point, the district court ruled that "Agent Martinson abandoned his job duties when he threw Mr. Maldonado to the floor." *Id.* For these reasons, the court concluded that Agent Martinson had not shown that his conduct met *Birkner*'s first condition. *Id.*

The district court's findings leave Agent Martinson in a tough spot. Under those fact findings, he must argue that ICE authorizes and requires its agents to harm detainees even when the detainees present no safety or compliance issues. Obviously, any such argument fails. Instead, absent those concerns, ICE imposes duties on its agents to safely deliver detainees to holding cells for transport back to the local jail to await deportation. By the district court's findings, Agent Martinson's conduct did not serve ICE's objective, in fact, just the opposite.

To wrestle free of this, Agent Martinson makes five arguments. First, he simply offers his own version of facts, ignoring our standard of review. Approaching us as the ultimate fact finder, he treats his own testimony as credible and substitutes his preferred fact findings for the district court's. For example, he argues that Maldonado's takedown happened because Maldonado

24

was resisting; that the logical next step for him to take was using physical force to subdue an unruly detainee; that he took Maldonado to the ground so he could better control him; that his sole motivation was to gain compliance; that Maldonado posed a threat to the agents; that Agent Martinson felt threatened; and that he was not trying to hurt Maldonado. But he must abide by the district court's fact findings—they are not clearly erroneous and, in fact, are well supported by the record.

Second, he measures his conduct against his job duties by referencing other conduct not underlying Maldonado's claims—his separating Maldonado from the other detainees, his shackling him, and his escorting him toward Cell 1. We conclude, as did the district court, that Agent Martinson acted within the scope of employment until the unjustified takedown. But that gives Agent Martinson no license to later injure Maldonado. In other words, Agent Martinson cannot dilute his misconduct with earlier authorized conduct. If *Birkner* allowed that, the crisis worker could have diluted his sexual misconduct with the two months of authorized counseling preceding it.

In fact, the case *Birkner* cites in its discussion of the first condition undercuts Agent Martinson's above argument. 771 P.2d at 1057 (citing *Keller v. Gunn Supply Co.*, 220 P. 1063 (Utah 1923)). In *Keller*, a food-dining employee knocked a customer unconscious after mistakenly thinking the customer had insulted his wife. 220 P. at 1063. At trial, the employee claimed that he had acted within his employment duties by maintaining order in the dining

25

establishment. *Id.* The court ruled that "[t]he assault was clearly outside of the scope of [the employee's] employment, and was prompted by some fancied personal grievance of [the employee's]." *Id.* at 1064. In view of the district court's fact findings, the same reasoning applies to Agent Martinson.

Third, Agent Martinson contends that "[t]he district court seemingly ignored [*Birkner*'s first condition and] focused instead on Martinson's motivation, thereby failing to analyze whether Martinson was engaged in performing his assigned duties and conducting ICE's business." Appellant's Opening Br. 31. In fact, the district court simply applied *Birkner*'s first condition. Under this first condition, the district court must resolve whether the employee was "wholly involved in a personal endeavor." *Pinedo*, 2018 WL 6331808, at *8 (quoting *Birkner*, 771 P.2d at 1057). Here, the district court answered yes, finding that Agent Martinson had "meant to harm Mr. Maldonado, not to gain compliance or to protect someone's safety. Physically harming a detainee as punishment is completely outside the bounds of ICE's interests and the duties an agent is hired to perform." *Id.* On this basis, the court held that "Agent Martinson abandoned his job duties when he threw Mr. Maldonado to the floor." *Id.* ICE employed Agent Martinson "to process detainees and keep fellow agents and detainees safe while maintaining order at the facility." *Id.* at 1057. The district court properly applied the first *Birkner* condition.

Fourth, Agent Martinson claims that the district court failed to consider the purposes of respondeat superior. But as we read the Utah cases, those

26

purposes are already built into the *Birkner* factors. We see nothing in Utah law directing us to ignore these conditions, for instance, to ensure a plaintiff the most solvent defendant. For example, *M.J.*—which the district court relied on in part, *see Pinedo*, 2018 WL 6331808, at *8–9 (citing *M.J.*, 371 P.3d at 31)— recites the general purposes of respondeat superior as part of the scope-of-employment discussion, and does so in support of its application of the *Birkner* conditions. *M.J.*, 371 P.3d at 30–34.

Fifth, Agent Martinson argues that the district court erred by failing to analyze, or give weight to, the policy objectives behind Utah's test. But *Birkner* articulated a clear analysis for scope-of-employment determinations that does not require a separate policy-driven analysis.[15] *See* 771 P.2d at 1057; *see also Clark v. Pangan*, 998 P.2d 268, 273 (Utah 2000) ("The three-part test set out

---

[15] To prevail, Agent Martinson must satisfy the two remaining *Birkner* conditions. *See Christensen v. Burns Int'l Sec. Servs.*, 844 P.2d 992, 994 (Utah Ct. App. 1992) ("Because an employee is outside the scope of employment if one of the three *Birkner* factors is not satisfied, we do not discuss the remaining factors."), *rev'd on other grounds sub nom. Christensen v. Swenson*, 874 P.2d 125 (Utah 1994); *see also Pangan*, 998 P.2d at 273 ("[I]f the employee acts from purely personal motives . . . in no way connected with the employer's interests. . . the conduct should be considered outside the scope of employment." (second alteration in original) (internal quotation marks and citations omitted)); *Jackson v. Righter*, 891 P.2d 1387, 1391–92 (Utah 1995) ("An employee's conduct is usually not in the scope of employment where the employee's motivation for the activity is personal, even though some transaction of business or performance of duty may also occur." (citations omitted)); *Hodges v. Gibson Prod. Co.*, 811 P.2d 151, 157 (Utah 1991) ("[T]here is no vicarious liability for an employer when an employee acts entirely on personal motives unrelated to the employer's interest." (citations omitted)). Even so, we now address *Birkner*'s third condition too.

27

in *Birkner* was carefully considered. This court has observed that the *Birkner* test provides flexibility, enabling it to be applied in various factual situations." (citations omitted)).

### B. Agent Martinson's Motivation Was to Punish Maldonado, Not to Further ICE's Interests.

The district court recited the third *Birkner* condition, noting that an employee must show that his "purpose or intent, however misguided in its means, [was] to further the employer's business interests." *Pinedo*, 2018 WL 6331808, at *8 (alteration in original). The court further noted that "[i]f the employee acts from purely personal motives . . . in no way connected with the employer's interests or if the conduct is unprovoked, highly unusual, and quite outrageous, then the master is not liable."[16] *Id.* (omission in original) (internal quotation marks and citations omitted). Here again, the district court's fact findings answer the argument. The district court found that Agent Martinson's conduct was "motivated purely by a desire to punish Mr. Maldonado" and that Agent "Martinson acted solely from personal motives." *Id.* at *9. Relying in part on expert Vitello, the district court further rejected Agent Martinson's argument that he was "motivated at least in part to serve his employer's purpose because

---

[16] The district court noted that the parties disagreed whether the "unprovoked, highly unusual, and quite outrageous" question is an alternative way to satisfy the third condition or simply a device in measuring it. *Pinedo*, 2018 WL 6331808, at *9. But the court avoided answering that question, ruling that Agent Martinson failed either way. *Id.* We decline to decide that issue for the same reason.

he was attempting to maintain order and control a non-compliant detainee." *Id.* Again, we agree with the district court's reasoning and its application of Utah law.

The district court then considered whether Agent Martinson's conduct was "unprovoked, highly unusual, and quite outrageous." *Id.* And again, the district court's fact findings decide the issue. The district court found that Agent Martinson's conduct was "unprovoked" and not justified by any "discernable resistance or danger." *Id.* The court also found that Agent Martinson's conduct was "highly unusual." *Id.* Here, the court noted that Agent Martinson's performing an untaught "hard technique" on a completely shackled person, was unapproved conduct, in fact, it was "unheard of." *Id.* Finally, the court found that Agent Martinson's conduct was "quite outrageous," especially given his position of power and authority over Maldonado, who, shackled in full restraints, was a very vulnerable detainee. *Id.* Once again, based on the fact findings, we agree with the district court's reasoning and its application of Utah law. Agent Martinson fails to satisfy either of the remaining *Birkner* conditions, let alone both, so the district court did not err in ruling that his conduct was outside his scope of employment.

### III.   We Lack Jurisdiction to Hear Maldonado's Separate Appeal.

Maldonado filed a separate appeal of the district court's denial of Agent Martinson's Westfall petition.[17] His appeal incorporated Agent Martinson's brief. But because the Westfall-petition issue was between Agent Martinson and the government—and not Maldonado—this court sua sponte ordered Maldonado to address the "jurisdictional basis of his appeal" in his opening brief. Order at 2, Feb.15, 2019.

In that brief, Maldonado claims that this court has jurisdiction over his separate appeal under the collateral-order doctrine. Undoubtedly, the district court's order denying Agent Martinson Westfall Act protection "qualifies as a reviewable final decision under 28 U.S.C. § 1291." *Osborn*, 549 U.S. at 226; *see also Woodruff v. Covington*, 389 F.3d 1117, 1122 (10th Cir. 2004). But this provides Agent Martinson an interlocutory appeal, not outsiders to the Westfall-petition dispute.

In addition, Maldonado meets none of the limited exceptions allowing third-party standing. "A well-founded prudential-standing limitation is that litigants cannot sue in federal courts to enforce the rights of others." *RMA Ventures Cal. v. SunAmerica Life Ins.*, 576 F.3d 1070, 1073 (10th Cir. 2009); *see also The Wilderness Soc. v. Kane Cty.*, 632 F.3d 1162, 1171 (10th Cir. 2011) (en

---

[17] Maldonado's appeal, 19-4013, was consolidated by our court with Agent Martinson's appeal, 19-4004.

banc) ("A party may suffer a cognizable injury but still not possess a right to relief.").

Maldonado is not asserting his personal rights, but instead Agent Martinson's.[18] The district court decision that Maldonado asks us to review—the denial of Agent Martinson's certification request—"subjects [Agent Martinson] to the burden of defending a suit, a burden from which the Westfall Act spares him." *Osborn*, 549 U.S. at 238–39. (alterations and internal quotation marks omitted). It does not deny Maldonado any right or resolve any aspect of his underlying tort claims.[19]

## CONCLUSION

For all the reasons given, we affirm the district court's decision to deny Agent Martinson's Westfall petition. And we dismiss Maldonado's separate appeal for lack of standing.

Entered for the Court

Gregory A. Phillips
Circuit Judge

---

[18] The general prohibition against asserting the rights of third parties exists, in part, because we recognize that "third parties themselves usually will be the best proponents of their own rights." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976).

[19] And contrary to Maldonado's assertion, the district court's order is reviewable absent his appeal; because we have jurisdiction to consider Agent Martinson's (the party whose rights are implicated in the order) appeal of the same order.